**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **ELECTRONICS AND TELECOMMUNICATIONS RESEARCH INSTITUTE; UNIVERSITY-INDUSTRY COOPERATION GROUP OF KYUNG HEE UNIVERSITY; INDUSTRY-UNIVERSITY COOPERATION FOUNDATION OF KOREA AEROSPACE UNIVERSITY; AND KWANGWOON UNIVERSITY INDUSTRY-ACADEMIC COLLABORATION FOUNDATION,** | **Civil Action No.** |
| **Plaintiffs,** | **JURY TRIAL DEMANDED** |
| **v.** | |
| **THE WALT DISNEY COMPANY, DISNEY MEDIA AND ENTERTAINMENT DISTRIBUTION LLC, DISNEY DTC LLC, DISNEY STREAMING SERVICES LLC, DISNEY ENTERTAINMENT & SPORTS LLC, DISNEY PLATFORM DISTRIBUTION, INC., BAMTECH, LLC, HULU, LLC, AND ESPN, LLC,** | |
| **Defendants.** | |

## ORIGINAL COMPLAINT

Plaintiffs Electronics and Telecommunications Research Institute ("ETRI"), University-Industry Cooperation Group of Kyung Hee University ("Kyung Hee University"), Industry-University Cooperation Foundation of Korea Aerospace University ("KAU"), and Kwangwoon University Industry-Academic Collaboration Foundation ("Kwangwoon University"), collectively "Plaintiffs," file this Original Complaint against The Walt Disney Company; Disney Media and Entertainment Distribution LLC; Disney Streaming Services LLC; Disney Entertainment & Sports LLC; Disney DTC LLC; Disney Platform Distribution, Inc.; BAMTech, LLC; Hulu, LLC; and

ESPN, LLC (collectively, "Defendants" or "Disney"), and allege as follows:

**NATURE OF THE ACTION**

1. ETRI is a government research institution founded in 1976 in Daejeon, South Korea that has played a key role in advancing information and communication technology. ETRI employs around 2,000 employees, the vast majority of whom are researchers. As part of its research and development efforts, ETRI plays an active role in international standard setting organizations such as the International Telecommunication Union Telecommunication Standardization Sector ("ITU-T") and the ISO/IEC Joint Technical Committee ("JTC"), having held nine chair and vice-chair positions. In total, ETRI employees hold over 80 leadership roles across various international standards development organizations. ETRI is also an active developer of video coding technologies. ETRI has made many proposals to various ITU Recommendations and has been awarded hundreds of U.S. patents related to the HEVC video coding standard.

2. Kyung Hee University is a private research university in Seoul, South Korea, founded in 1949, that, through its University-Industry Cooperation Group, holds numerous patents related to video coding technology and is a notable contributor to the development of video coding standards. Kyung Hee University and ETRI frequently collaborate, including with respect to video coding research, and have developed over 100 patent families together.

3. KAU is a private university in Goyang, Gyeonggi Province, South Korea, founded in 1952 and located near Gimpo International Airport. It specializes in a variety of technical fields, and through its Industry-University Cooperation Foundation, holds a number of patents related to video coding technology and actively contributes to the development of video coding standards.

4. Kwangwoon University is a private research university in South Korea founded in 1934. Kwangwoon University and ETRI frequently collaborate. Kwangwoon University was the first institution to teach electronic engineering in Korea. It has evolved into a comprehensive university

renowned for its focus on science and technology. The university is acclaimed for its robust programs in electronics, information and communications engineering, computer science, and robotics, fields in which it has consistently ranked among Korea's top institutions.

5. Disney uses video coding technology as part of its streaming video product, including Disney+, Hulu, Hulu Live, and ESPN, which allows users to view a wide range of movies, sports, TV shows, and other videos. Disney performs video coding to make high-quality videos available on a wide range of devices. Disney does this as part of applications and backend processes (together with associated equipment, the "Accused Services"), including for example transcoding and encoding for the purpose of providing videos to users, that infringe one or more claims in Plaintiffs' Asserted Patents (as defined below).

6. Disney relies on Plaintiffs' innovations to efficiently deliver high-quality video to users throughout the United States and the world. These innovations are important to Disney's business, driving the efficiency and quality of the videos that help keep users engaged on Disney's streaming services. While other companies have recognized and validated the strength of Plaintiffs' video patent portfolio by taking licenses, Disney continues to use Plaintiffs' patented technology without a license, thereby obtaining an unfair competitive advantage and failing to fairly compensate Plaintiffs. Plaintiffs bring this lawsuit to end Disney's unlicensed use of Plaintiffs' patented technology.

## PARTIES

7. ETRI is based in the Republic of Korea (South Korea) with an address at 218 Gajeong-ro, Yuseong-gu, Daejeon, 34129, Korea.

8. Kyung Hee University is based in the Republic of Korea (South Korea) with an address at 26, Kyungheedae-ro, Dongdaemun-gu, Seoul, 02447.

9. KAU is based in the Republic of Korea (South Korea) with an address at 76

Hanggongdaehak-ro, Deogyang-gu, Goyang-si, Gyeonggi-do, 10540.

10. Kwangwoon University is based in the Republic of Korea (South Korea) with an address at 20 Gwangun-ro, Nowon-gu, Seoul, 01897.

11. ETRI and Kyung Hee University are the owners by assignment of all right, title, and interest in U.S. Patent No. 11,595,643 (the "'643 Patent"). ETRI is the sole owner by assignment of all right, title, and interest in U.S. Patent No. 10,021,416 (the "'416 Patent") and U.S. Patent No. 10,003,820 (the "'820 Patent"). ETRI and KAU are the owners by assignment of all right, title, and interest in U.S. Patent No. 10,194,168 (the "'168 Patent"). ETRI, Kyung Hee University, and Kwangwoon University are the owners by assignment of all right, title, and interest in U.S. Patent No. 10,742,996 (the "'996 Patent").

12. The '643 Patent, the '416 Patent, the '168 Patent, the '996 Patent, and the '820 Patent are collectively referred to as the "Asserted Patents."

13. Defendant The Walt Disney Company is a Delaware corporation with a principal place of business at 500 South Buena Vista Street, Burbank, California, 91521. The Walt Disney Company has designated Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808 as its agent for service of process. On information and belief, The Walt Disney Company is the ultimate parent company responsible for managing and directing operations, along with its subsidiaries, for all Disney streaming entities.[1]

14. Defendant Disney Media and Entertainment Distribution LLC ("DMED") is a Delaware limited liability company with a principal place of business at 500 South Buena Vista Street, Burbank, California, 91521. Disney Media and Entertainment Distribution LLC has designated

---

[1] The Walt Disney Company, 2025 Form 10-K, at 2, *available at* https://www.sec.gov/Archives/edgar/data/1744489/000174448925000155/dis-20250927.htm.

Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808 as its agent for service of process. On information and belief, Disney Media and Entertainment Distribution LLC is an indirectly wholly owned subsidiary of The Walt Disney Company involved in activities relating to P&L management, distribution, operations, sales, advertising, data, and technology for Disney+, Hulu, Hulu Live, and the ESPN streaming services.[2]

15. Defendant Disney DTC LLC is a Delaware limited liability company with a principal place of business at 500 South Buena Vista Street, Burbank, California 91521. Disney DTC LLC has designated Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808 as its agent for service of process.[3] On information and belief, Disney DTC LLC is an indirectly wholly owned subsidiary of The Walt Disney Company that is involved in content planning and management, third party media sales efforts, affiliate marketing, affiliate related business operations, contract negotiation for distribution deals, and procuring content delivery network and cloud computing for Disney+, Hulu, Hulu Live, and the ESPN streaming services.[4]

---

[2] The Walt Disney Company, 2023 Form 10-K, at 86; The Walt Disney Company, 2025 Form 10-K, at 7, https://s206.q4cdn.com/979796730/files/doc_financials/2025/ar/2025-Annual-Report.pdf ("ESPN offers a U.S. subscription-based DTC service with two plans: ESPN Select and ESPN Unlimited, which started in August 2025. ESPN Select, previously the ESPN+ service through August 2025, offers thousands of live sporting events, on-demand sports content and other original content."); *see also Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231 (D. Del. 2024), Dkt. 18 at 1.

[3] Public filings indicate that Disney DTC LLC may now be known as Disney Platform Distribution, Inc. *See e.g.*, *In re Disney DTC, LLC*, No. 05-23-00485-CV, 2024 WL 358117 (Tex. App.—Dallas Jan. 31, 2024). On this basis, all allegations relating to Disney DTC LLC shall also apply to Disney Platform Distribution, Inc.

[4] The "Terms of Use" page on the ESPN website links to a Disney webpage that states, "Disney DTC LLC and/or its affiliates and subsidiaries (collectively, 'Disney' 'we' or 'us') are pleased to provide to you certain websites, software, applications, content, products, and services in any media format or channel, now known or hereafter devised ('Disney Products' and 'Products'), which may be branded Disney, ABC, ESPN, Marvel, Pixar, Lucasfilm, FX, Searchlight Pictures, 20th Century Studios, National Geographic, or another brand owned or licensed by Disney." *English – Disney Terms of Use – United States*, THE WALT DISNEY COMPANY (May 24, 2024),

16. Defendant Disney Streaming Services LLC is a Delaware limited liability company with a principal place of business at 500 South Buena Vista Street, Burbank, California, 91521. Disney Streaming Services LLC has designated Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808 as its agent for service of process. On information and belief, Disney Streaming Services LLC is an indirectly wholly owned subsidiary of The Walt Disney Company and is involved in financial and marketing activities for Disney+, Hulu, Hulu Live, and the ESPN streaming services.[5]

17. Disney Entertainment & Sports LLC[6] is a Delaware limited liability company with a principal place of business at 500 South Buena Vista Street, Burbank, California, 91521. Disney Entertainment & Sports LLC has designated Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808 as its agent for service of process. On information and belief, Disney Entertainment & Sports LLC is an indirectly wholly owned subsidiary of the Walt Disney Company and is involved in designing and maintaining the websites for Disney+, Hulu, Hulu Live, and the ESPN streaming services.[7]

18. Defendant Disney Platform Distribution, Inc. is a Delaware corporation with a principal

---

https://disneytermsofuse.com/english/; *see also Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231 (D. Del. 2024), Dkt. 18 at 1.

[5] Disney Streaming Services, LLC is listed as the distribution entity for both Disney+ and the ESPN streaming services on the Disney website. *The Walt Disney Family of Companies*, THE WALT DISNEY COMPANY, https://privacy.thewaltdisneycompany.com/en/company-overview/. *See also Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231 (D. Del. 2024), Dkt. 18 at 2.

[6] Delaware and California public filings indicate that Disney Entertainment & Sports LLC was previously called Disney Streaming Technology LLC and/or Disney Technology LLC. For the avoidance of doubt, and with the goal to provide adequate notice to the appropriate party, all allegations relating to Disney Entertainment & Sports LLC shall also apply to Disney Streaming Technology LLC and Disney Technology LLC, and vice versa.

[7] *See e.g., Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231 (D. Del. 2024), Dkt. 18 at 2.

place of business at 500 South Buena Vista Street, Burbank, California, 91521. Disney Platform Distribution, Inc. has designated Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808 as its agent for service of process. On information and belief, Disney Platform Distribution, Inc. is an indirectly wholly owned subsidiary of The Walt Disney Company that is involved in various aspects of Disney+, Hulu, Hulu Live, and the ESPN streaming services such as managing distribution efforts, affiliate marketing, affiliate-related business operations, contract negotiation, content delivery networks, and cloud computing services.[8]

19. Defendant BAMTech, LLC ("BAMTech") is a Delaware limited liability company with a principal place of business at 1211 Avenue of the Americas, New York, New York 10036. BAMTech, LLC has designated Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808 as its agent for service of process. On information and belief, BAMTech, LLC is an indirect subsidiary of The Walt Disney Company, which owns 80% of BAMTech, and Hearst Brazil, Inc., a subsidiary of The Hearst Corporation, which owns the remaining 20% of BAMTech.[9] On information and belief, BAMTech, LLC is responsible for developing and maintaining the ESPN streaming website,[10] and provides technology that is used in Disney+ and Hulu.[11]

---

[8] The subscriber agreement for Disney+ and the ESPN streaming services is hosted on a Disney webpage and refers to Disney Platform Distribution, Inc. as the relevant entity. *Disney+, ESPN, and Hulu Subscriber Agreement*, DISNEY+ (Feb. 5, 2026), https://www.disneyplus.com/legal/subscriber-agreement. *See also Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231 (D. Del. 2024), Dkt. 18 at 2.

[9] *Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231 (D. Del. 2024), Dkt. 18 at 2.

[10] The Walt Disney Company, 2024 Form 10-K, at 89 (stating that The Walt Disney Company purchased MLB's 15% interest in BAMTech LLC in November 2022). The "Privacy Policy" tab on the BAMTech website links to a page on a Disney website. The subscriber agreement for Disney+, ESPN, and Hulu is hosted on a Disney webpage and refers to BAMTech, LLC as the relevant entity. *Disney+, ESPN, and Hulu Subscriber Agreement*, DISNEY+ (Feb. 5, 2026), https://www.disneyplus.com/legal/subscriber-agreement.

[11] Alex Werpin, *Disney Pays $900M for MLB's Remaining Stake in Streaming Company BAMTech*, HOLLYWOOD REPORTER (Nov. 29, 2022),

20. Defendant Hulu, LLC ("Hulu") is a Delaware limited liability company with a principal place of business at 2500 Broadway, Santa Monica, CA 90404. Hulu, LLC has designated Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808 as its agent for service of process. On information and belief, Hulu, LLC is an indirect subsidiary of The Walt Disney Company. On information and belief, Hulu, LLC operates Hulu and Hulu Live.[12]

21. Defendant ESPN, LLC ("ESPN") is a Delaware limited liability company with a principal place of business at ESPN Plaza, Bristol, Connecticut 06010. ESPN, LLC has designated Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808 as its agent for service of process. On information and belief, ESPN, LLC is an indirect subsidiary of The Walt Disney Company, which owns 80% of ESPN, and Hearst Brazil, Inc., a subsidiary of The Hearst Corporation, which owns the remaining 20% of ESPN.[13] On information and belief, ESPN, LLC manages and operates the ESPN streaming services.[14]

## JURISDICTION AND VENUE

22. This Court has exclusive subject matter jurisdiction over the patent infringement claims in this case under 28 U.S.C. §§ 1331 and 1338.

23. The Court also has supplemental jurisdiction over all claims other than the patent infringement claims in this case under 28 U.S.C. § 1367(a), including over Count VI (declaratory judgment that Plaintiffs have complied with any RAND commitments). An actual controversy over

---

https://www.hollywoodreporter.com/business/digital/disney-pays-900m-for-bamtech-1235271788/.

[12] The Walt Disney Company, 2024 Form 10-K, at 88-89 (stating that The Walt Disney Company owns 67% of Hulu and purchased NBC Universal's 33% interest in Hulu in November 2023). The "Privacy Policy" tab on the Hulu website links to a page on a Disney website.

[13] *Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231 (D. Del. 2024), Dkt. 18 at 2.

[14] The Walt Disney Company, 2024 Form 10-K, at 7 (stating that ESPN is 80% owned by the Walt Disney Company). The "Terms of Use" tab on the ESPN website links to a page on a Disney website.

all counts exists between the parties to this case.

24. This Court has general personal jurisdiction over each Disney defendant by virtue of its incorporation in Delaware. Disney has appointed Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808 as its agent for service of process.

25. This Court has specific personal jurisdiction over Disney because Disney has, directly and/or through agents and/or intermediaries, committed acts and continues to commit acts of patent infringement, including within Delaware, giving rise to this action and has established minimum contacts with Delaware such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

26. Disney, among other things, uses the infringing Accused Services to encode videos for distribution to end users' devices, and to place them on the stream of commerce for use in Delaware. Disney also decodes video using the Accused Services, for example as part of the encoding process; to test and operate the Accused Services; and to decode content to be transcoded into formats for distribution.

27. On information and belief, Disney regularly conducts and has conducted business in Delaware and purposefully avails itself of the privileges of conducting business in Delaware. On information and belief, Disney, and/or its agents and/or intermediaries, makes, uses, imports, offers for sale, sells, and/or advertises its products and affiliated services in Delaware, sufficient to give rise to jurisdiction.

28. On information and belief, Disney derives and has derived substantial revenue from the Accused Services within Delaware, and/or expects or should reasonably expect its actions to have consequences in Delaware.

29. Disney's infringing activity has led to foreseeable harm and injury to Plaintiffs.

30. Venue is proper under 28 U.S.C. § 1391 and 28 U.S.C. § 1400(b). As set forth above, Disney has committed acts of infringement in this District and is incorporated in this District.

## FACTUAL BACKGROUND

31. For many years, Plaintiffs have been leaders in innovating and delivering cutting-edge research that enables faster, more efficient video communications, along with a variety of other technologies.

32. Plaintiffs invent and license video coding technologies to improve the ways people experience media and communicate with each other, and Plaintiffs have been awarded hundreds of patents related to the HEVC Standard.

33. Disney is one of the world's leading entertainment companies, and produces and distributes a wide variety of content, including its traditional movie business, ESPN, Hulu, Star Wars, Marvel, Pixar, and National Geographic. Today, it distributes much of its content through direct-to-consumer streaming, or "DTC Streaming" platforms, including Disney+, ESPN Select, ESPN Unlimited, Hulu, and Hulu Live. These platforms allow users to watch video over the Internet using platforms like smart TVs, web browsers, mobile devices, tablets, streaming sticks, gaming consoles, and set-top boxes. Super Bowl LXI will be streamed on Disney+, alongside Disney's wide collection of movies and TV episodes.[15]

34. Each of Disney's DTC Streaming platforms uses formats such as H.265 (High Efficiency Video Coding, or HEVC) to encode and decode user content. In doing so, Disney practices the Asserted Patents as part of its Accused Services. Disney has admitted that Disney+ uses the HEVC/H.265 codec. *See Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231-MN (D. Del. Oct. 31, 2025), Dkt. 66 ¶ 526 ("Disney further admits Disney+ uses the

---

[15] ESPN, ESPN's Super Bowl LXI broadcast will also stream on Disney+, https://www.espn.com/nfl/story/_/id/50125971/espn-super-bowl-61-broadcast-stream-disney+

HEVC/H.265 codec.").

35. The Disney+, Hulu, Hulu Live, and the ESPN streaming services are not operated by a single entity. Rather, multiple Disney subsidiaries and affiliates each perform distinct functions in creating, managing, and delivering the accused streaming services. The following sections describe the specific roles those entities play and the relationships among them.

### A. DEFENDANTS' ROLES IN OPERATING THE STREAMING SERVICES

36. The Walt Disney Company is the ultimate parent of the Disney enterprise involved in the accused streaming services. It establishes corporate priorities, allocates resources, sets commercial objectives, and oversees the businesses that present Disney+ and Hulu entertainment and the ESPN streaming services sports content to subscribers.[16] On information and belief, it directs and oversees the subsidiaries and affiliates below it, which carry out distinct portions of the streaming business, including content, distribution, technology, marketing, and platform operations. The following paragraphs describe the specific roles of each Defendant within that enterprise.

37. On information and belief, The Walt Disney Company directs the operations of the Disney Entertainment and ESPN segments, including the teams and executives charged with Disney+, Hulu, Hulu Live, and the ESPN streaming services. Through those segments, the parent determines how content, technology, distribution, advertising, and subscriber services are organized.

38. The Disney Entertainment segment houses the Disney+ and Hulu businesses,[17] while the

---

[16] *See, e.g.*, *Justin Connolly*, THE ORG, https://web.archive.org/web/2024/https://theorg.com/org/disney/org-chart/justin-connolly (last accessed Sept. 17, 2026 via Internet Archive); *see also The Walt Disney Company Announces Strategic Restructuring, Restoring Accountability To Creative Businesses*, THE WALT DISNEY COMPANY (Feb. 9, 2023), https://thewaltdisneycompany.com/the-walt-disney-company-announces-strategic-restructuring-restoring-accountability-to-creative-businesses/.

[17] Disney admitted that "The Walt Disney Company's Disney Entertainment segment includes Disney+ and Hulu, and that the ESPN business segment includes ESPN+." *Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231-MN (D. Del. Oct. 31, 2025), Dkt. 66 ¶ 158.

ESPN segment houses the ESPN streaming services. On information and belief, shared Disney organizations, including Product & Technology, Advertising Sales, and Platform Distribution, serve both segments and provide common capabilities used across the accused platforms.

39. On information and belief, executives employed or controlled by The Walt Disney Company make decisions concerning the design, launch, pricing, distribution, promotion, and continued operation of each accused platform. The Walt Disney Company receives the economic benefits of those activities through the enterprise's subscription, advertising, licensing, and content businesses.

40. On information and belief, The Walt Disney Company therefore participates in the accused technology chain even when a particular task is performed by a subsidiary or shared-service group. Its enterprise management includes oversight of the encoding, transcoding, storage, delivery, decoding, and playback functions used to provide video to subscribers.

41. Disney Media and Entertainment Distribution LLC is a subsidiary of The Walt Disney Company that remains a distinct legal entity within the Disney corporate structure.[18] In February 2023, The Walt Disney Company reorganized its media and entertainment operations—previously reported as a single segment—into the Entertainment and Sports segments.[19] On information and belief, DMED continues to perform or support operational, distribution, and commercial functions for the direct-to-consumer businesses, including functions related to Disney+, Hulu, and the ESPN streaming services.[20]

---

[18] The Walt Disney Company, 2025 Form 10-K, Exhibit 21 (listing Disney Media & Entertainment Distribution LLC as a subsidiary).

[19] *The Walt Disney Company Announces Strategic Restructuring, Restoring Accountability To Creative Businesses*, THE WALT DISNEY COMPANY (Feb. 9, 2023), https://thewaltdisneycompany.com/the-walt-disney-company-announces-strategic-restructuring-restoring-accountability-to-creative-businesses/.

[20] *See, e.g.,* The Walt Disney Company, 2023 Form 10-K, at 86; *The Walt Disney Company Announces Strategic Restructuring, Restoring Accountability To Creative Businesses*, THE WALT

42. On information and belief, DMED performs or supports distribution, operations, sales, advertising, data, and technology functions for one or more of the Disney streaming platforms. Its responsibilities relate to the commercial and operational aspects of the direct-to-consumer businesses.

43. On information and belief, DMED coordinates or supports commercial, distribution, advertising, and operational activities for one or more of the accused streaming services, including activities relating to the delivery of video to subscribers.

44. On information and belief, DMED participates in the business processes by which video is prepared for distribution, placed into the streaming supply chain, and made available through applications and connected devices.

45. On information and belief, DMED coordinates or supports the monetization of one or more of the platforms through subscription sales, advertising, distribution arrangements, and related commercial channels. Its participation in those revenue-producing activities gives it a financial interest in the continued operation of the accused services.

46. Disney DTC LLC (also known as Disney Platform Distribution, Inc.) is an indirectly wholly owned subsidiary of The Walt Disney Company. On information and belief, Disney DTC LLC is the distribution-facing entity for Disney's direct-to-consumer services, is identified as a party to the Disney+, ESPN, and Hulu subscriber agreement, and performs content, distribution, marketing, and procurement functions for the streaming businesses.[21]

47. Disney DTC LLC manages content planning and content administration for Disney+ and

---

DISNEY COMPANY (Feb. 9, 2023), https://thewaltdisneycompany.com/the-walt-disney-company-announces-strategic-restructuring-restoring-accountability-to-creative-businesses/.

[21] *See Subscriber Agreement*, DISNEY+ (Feb. 5, 2026), https://www.disneyplus.com/legal/subscriber-agreement.

Hulu. Its work includes deciding how programming is organized, scheduled, packaged, and made available through the on-demand services, and it supports related planning for Hulu Live and the ESPN streaming services through shared Disney operations.[22]

48. On information and belief, Disney DTC LLC manages third-party distribution efforts, including third-party media sales, affiliate marketing, and affiliate-related business activities associated with Disney+ and Hulu. Those activities help place the services with distributors and other commercial partners and also support the sale of Hulu Live and offerings from the ESPN streaming services through the broader Disney portfolio.

49. On information and belief, Disney DTC LLC negotiates or participates in agreements governing the distribution of content for Disney+ and Hulu and secures content delivery network capacity and cloud-computing resources used to store, process, and deliver video for the Disney services.

50. Through those functions, Disney DTC LLC affects which video assets enter the streaming pipeline, the commercial terms under which they are distributed, and the infrastructure used to transmit encoded video. On information and belief, it performs or directs these activities in coordination with DMED and the other Defendants for all Disney platforms.

51. Disney Streaming Services LLC is an indirectly wholly owned subsidiary of The Walt Disney Company. On information and belief, it provides finance and marketing services for Disney+, Hulu, Hulu Live, and the ESPN streaming services and supports the commercial

---

[22] *See The Walt Disney Company Announces Strategic Restructuring, Restoring Accountability To Creative Businesses*, THE WALT DISNEY COMPANY (Feb. 9, 2023), https://thewaltdisneycompany.com/the-walt-disney-company-announces-strategic-restructuring-restoring-accountability-to-creative-businesses/. In addition, Disney admitted that DTC "is responsible for certain aspects of content management and planning for Disney+" and for Hulu. *Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231-MN (D. Del. Oct. 31, 2025), Dkt. 66 ¶¶ 88-89.

administration of those offerings.[23]

52. On information and belief, for Disney+ and Hulu, Disney Streaming Services LLC helps plan budgets, marketing campaigns, subscriber acquisition, and promotional activity. It performs corresponding finance and marketing functions for Hulu Live and the ESPN streaming services, including campaigns that present those services separately and as part of bundles.

53. On information and belief, Disney Streaming Services LLC's financial personnel track the costs of platform operation, including technology, cloud, delivery, and content-related expenses. Its marketing personnel promote the services whose delivery depends on the accused coding and distribution processes.

54. On information and belief, Disney Streaming Services LLC participates in decisions about the scale and timing of platform launches, product changes, promotional offers, and subscriber campaigns. Those decisions increase the use of the platforms and the volume of video processed through their systems.

55. Disney Entertainment & Sports LLC is an indirectly wholly owned subsidiary of The Walt Disney Company. On information and belief, it was formerly known as Disney Streaming Technology LLC and/or Disney Technology LLC, and it operates through the technology organization sometimes identified as DE&E Technology.

56. Disney Entertainment & Sports LLC designs, builds, and maintains front-end and back-end infrastructure for Disney+, Hulu, Hulu Live, and the ESPN streaming services. Its product and engineering teams develop the services through which users select, request, receive, decode, and

[23] Disney Streaming Services, LLC is listed as the distribution entity for both Disney+ and ESPN+ on the Disney website. *The Walt Disney Family of Companies*, THE WALT DISNEY COMPANY, https://privacy.thewaltdisneycompany.com/en/company-overview/.

view streaming video.[24]

57. On information and belief, the DE&E Technology organization performs end-to-end development for the streaming products. Its engineers create and maintain subscription services, account functions, application interfaces, content-management systems, advertising services, distribution tools, and other back-end systems that support Disney's media businesses.

58. On information and belief, the technology maintained by Disney Entertainment & Sports LLC includes critical back-end services that receive media, generate or manage encoded representations, route content to delivery networks, and support playback on subscriber devices. Those services are part of the infrastructure through which the Accused Services are used.

59. On information and belief, Disney Entertainment & Sports LLC's engineers also build infrastructure used by Disney's advertising and distribution businesses. Because the same services support subscription management, advertising insertion, content delivery, and platform operation, the entity's technology work benefits Disney+ and Hulu as well as Hulu Live and the ESPN streaming services.

60. BAMTech, LLC is an indirect subsidiary in which The Walt Disney Company owns approximately 80 percent and Hearst owns the remaining interest. BAMTech develops and maintains technology for streaming products and operates as a technology provider within Disney's broader

---

[24] *Sr Software Engineer*, DISNEY CAREERS (Jul. 24, 2026), https://www.disneycareers.com/en/job/santa-monica/sr-software-engineer/391/97917839392 ("Disney Entertainment and ESPN Product & Technology is a global organization of engineers, product developers, designers, technologists, data scientists, and more – all working to build and advance the technological backbone for Disney's media business globally"); *Lead Product Software Engineer (Kotlin)*, DISNEY CAREERS (Sep. 9, 2026), https://www.disneycareers.com/en/job/seattle/lead-product-software-engineer-kotlin/391/98050531456 ("The Product & Data Engineering team is responsible for end to end development for Disney's . . . consumer-facing products, including streaming platforms Disney+, Hulu, and ESPN+").

direct-to-consumer ecosystem.[25] A pending transaction, if consummated, would give NFL Enterprises LLC a 10 percent noncontrolling interest in ESPN, reducing The Walt Disney Company's effective interest to approximately 72 percent and Hearst's to approximately 18 percent.[26]

61. On information and belief, BAMTech develops and maintains the ESPN streaming website and associated services. It supplies technology used to operate Disney+, Hulu, and other Disney streaming offerings, including services that support Hulu Live and the delivery of sports programming through the ESPN streaming services.

62. On information and belief, BAMTech's technology includes software and systems that manage subscriber requests, organize media catalogs, communicate with delivery infrastructure, and support video playback. Those systems participate in the processing of video representations that use the coding technology at issue.

63. BAMTech is identified in the ESPN subscriber agreement and performs services for the ESPN streaming services. Its work also connects with Disney+ and Hulu because Disney uses common technology components and operating practices across those services.[27]

64. Hulu, LLC is a wholly owned subsidiary of The Walt Disney Company. In November 2023, Disney acquired NBCUniversal's remaining interest in Hulu, and in fiscal 2025, following completion of an appraisal process, Disney paid an incremental amount to acquire 100%

---

[25] Alex Weprin, *Disney Pays $900M for MLB's Remaining Stake in Streaming Company BAMTech*, HOLLYWOOD REPORTER (Nov. 29, 2022), https://www.hollywoodreporter.com/business/digital/disney-pays-900m-for-bamtech-1235271788/.

[26] The Walt Disney Company, 2025 Form 10-K, at 8, 91-92.

[27] *See Subscriber Agreement*, DISNEY+ (Feb. 5, 2026), https://www.disneyplus.com/legal/subscriber-agreement.

ownership.[28] Hulu, LLC remains the entity that operates the Hulu service and Hulu Live.[29] Following an October 2025 transaction, certain Hulu Live TV assets were combined with FuboTV Inc. to form a combined entity in which Disney holds a 70 percent interest. Disney remains the exclusive distributor of the Hulu Live TV service.[30]

65. On information and belief, Hulu, LLC supplies the end-to-end business and product functions for Hulu, including the on-demand library, and for Hulu Live, including live channels and related interactive features. It determines how those services are presented, maintained, and made available to subscribers.

66. On information and belief, Hulu, LLC participates in financing, marketing, content planning, product development, and distribution decisions for Hulu and Hulu Live. It also coordinates with Disney entities when Hulu content or subscriptions are offered through Disney+ or in combination with the ESPN streaming services.

67. On information and belief, Hulu uses technology, delivery networks, cloud services, and coding workflows supplied or managed by other Defendants. The resulting Hulu and Hulu Live streams are therefore produced through a coordinated chain that includes the Accused Services.

68. ESPN, LLC is an indirect subsidiary in which The Walt Disney Company owns approximately 80 percent and Hearst owns the balance. On information and belief, ESPN, LLC manages and operates the ESPN streaming services, which are sports-focused streaming offerings marketed under the ESPN brand.[31]

---

[28] The Walt Disney Company, 2025 Form 10-K, at 96.

[29] Disney admitted that "Hulu, LLC operates the Hulu and Hulu Live video streaming services." *Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231-MN (D. Del. Oct. 31, 2025), Dkt. 66 ¶¶ 570, 640, 920.

[30] The Walt Disney Company, 2025 Form 10-K, at 5, 19-20.

[31] The Walt Disney Company, 2024 Form 10-K, at 7 (stating that ESPN is 80% owned by the Walt Disney Company). The "Terms of Use" tab on the ESPN website links to a page on a Disney

69. On information and belief, ESPN, LLC manages the content slate and planning for the ESPN streaming services, including live sports, recorded programming, original programming, and related sports-media offerings. It determines how that programming is packaged, scheduled, promoted, and offered to subscribers.

70. On information and belief, ESPN, LLC also supplies financing and marketing direction for the ESPN streaming services. It works with Disney's distribution, technology, and platform teams to expand subscriptions and to place the ESPN streaming services within Disney's broader bundle and cross-promotion strategy.

71. On information and belief, the ESPN streaming services use shared account, application, delivery, and video-processing capabilities supplied by Disney and its affiliates. Accordingly, ESPN, LLC benefits from and participates in the technical systems through which video is encoded, delivered, decoded, and viewed.

72. The Defendants share material portions of the technology used to run the accused services. The DE&E Technology organization designs and builds infrastructure that supports media ingestion, content management, subscriber access, advertising, distribution, and playback across Disney+, Hulu, Hulu Live, and the ESPN streaming services.[32]

---

website. In addition, Disney admitted that "ESPN manages and operates ESPN+ video streaming service." *Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231-MN (D. Del. Oct. 31, 2025), Dkt. 66 ¶ 862. Disney also admitted the ESPN manages and operates "certain aspects of ESPN+." *Id.* ¶ 120.

[32] *See, e.g.*, *The Walt Disney Company Announces Strategic Restructuring, Restoring Accountability To Creative Businesses*, THE WALT DISNEY COMPANY (Feb. 9, 2023), https://thewaltdisneycompany.com/the-walt-disney-company-announces-strategic restructuring-restoring-accountability-to-creative-businesses/ ("several shared-service organizations across the company support both Disney Entertainment and ESPN, facilitating company-wide efficiencies and creating a more cost-effective, coordinated, and streamlined approach to operations. These include Product and Technology …."); *Sr Product Software Engineer*, DISNEY CAREERS (Sep. 17, 2026), https://www.disneycareers.com/en/job/santa-monica/sr-product-software-

73. BAMTech technology is another common component of the Disney streaming environment. On information and belief, the same or related BAMTech-developed services support Disney+, Hulu, and other Disney offerings, while also supporting the ESPN streaming website and associated subscriber functions.[33]

74. On information and belief, the common infrastructure allows the Defendants to reuse systems for ingesting source video, creating alternate representations, storing media, routing streams, and serving content to devices. On information and belief, those shared systems include components that perform or facilitate the accused video coding operations.

75. The Defendants also share personnel and managerial authority. For example, Aaron LaBerge previously served as President and Chief Technology Officer for Disney Entertainment and ESPN, placing technology leadership for Disney+, Hulu, Hulu Live, and the ESPN streaming services under a common executive structure.[34]

76. Justin Connolly has served as President of Disney DTC LLC and oversees distribution for the direct-to-consumer services. His responsibilities reach the commercial channels through which Disney+, Hulu, Hulu Live, and ESPN+ are offered to subscribers and partners.[35] And, Joe Earley

---

engineer/391/100720373248 (DE&E Technology "design[s] and build[s] the infrastructure that [powers] Disney's media, advertising, and distribution businesses").

[33] Alex Werpin, *Disney Pays $900M for MLB's Remaining Stake in Streaming Company BAMTech*, Hollywood Reporter (Nov. 29, 2022), https://www.hollywoodreporter.com/business/digital/disney-pays-900m-for-bamtech-1235271788/ ("BAMTech technology powers Disney+, Hulu and Disney's other offerings").

[34] Harry McCracken, *Why Disney Plus's new Hulu integration was such a huge, high-stakes challenge*, Fast Company (Dec. 7, 2023), https://www.fastcompany.com/90993539/disney-plushulu-integration-beta.

[35] *Justin Connolly*, THE ORG, https://web.archive.org/web/2024/https://theorg.com/org/disney/org-chart/justin-connolly (last accessed Sept. 17, 2026 via Internet Archive); *see also The Walt Disney Company Announces Strategic Restructuring, Restoring Accountability To Creative Businesses*, The Walt Disney Company (Feb. 9, 2023), https://thewaltdisneycompany.com/the-walt-disney-company-announces-strategic-restructuringrestoring-accountability-to-creative-businesses/ ("Effective

has served as President of Direct-to-Consumer and has led the Disney+ and Hulu businesses. Now, Joe Earley, along with Adam Smith, are co-presidents of Direct to Consumer where they manage financial performance across Disney+ and Hulu.[36] Earley's positions illustrate that strategic decisions for those services are made within a common Disney organization rather than by wholly independent businesses.[37]

77. On information and belief, employees assigned to product management, engineering, advertising, data, legal, finance, distribution, and subscriber support work for or are directed by more than one Defendant. Those shared personnel coordinate platform features and the handling of encoded video across the Disney services.[38]

78. Several Defendants identify 500 South Buena Vista Street, Burbank, California, as a principal place of business. The common location reflects the operational integration among the

---

immediately, several shared-service organizations across the company will support both Disney Entertainment and ESPN, facilitating company-wide efficiencies and creating a more cost-effective, coordinated, and streamlined approach to operations. These include . . . Platform Distribution led by Justin Connolly.").

[36] *The Walt Disney Company Sets Leadership Team for Expanded Disney Entertainment Segment*, THE WALT DISNEY COMPANY (Mar. 16, 2026), https://thewaltdisneycompany.com/news/entertainment-leadership-team/.

[37] *Our Executive Team*, HULU PRESS, https://web.archive.org/web/2024/https://press.hulu.com/bios/joe-earley/ (last accessed Sept. 17, 2026 via Internet Archive); *The Walt Disney Company Sets Leadership Team for Expanded Disney Entertainment Segment*, THE WALT DISNEY COMPANY (Mar. 16, 2026), https://thewaltdisneycompany.com/news/entertainment-leadership-team/; *see also Alisa Bowen Named President Of Disney+*, DISNEY+ (Sept. 29, 2022), https://press.disneyplus.com/news/alisa-bowen-named-president-of-disney-plus. In addition, Disney admitted that "certain employees are shared among certain of Defendants." *Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231-MN (D. Del. Oct. 31, 2025), Dkt. 66 ¶ 140.

[38] *Launch Readiness Program Manager*, DISNEY CAREERS (Sep. 16, 2026), https://www.disneycareers.com/en/job/santa-monica/launch-readiness-program-manager/391/100736260400 ("This position is with Hulu, LLC …."); *Sr Product Software Engineer*, DISNEY CAREERS (Sep. 17, 2026), https://www.disneycareers.com/en/job/santa-monica/sr-product-software-engineer/391/100720373248 ("This position is with Disney Entertainment & Sports LLC ….").

parent, DMED, Disney DTC LLC, Disney Streaming Services LLC, BAMTech, LLC, and Disney Entertainment & Sports LLC.

79. On information and belief, even where a particular Defendant lists another address, its platform work is performed through facilities, personnel, systems, and management coordinated with the Burbank operations. On information and belief, the Defendants use those shared facilities to plan and administer the accused streaming activities.

80. Subscribers generally use MyDisney accounts or related Disney account credentials to access more than one of the accused platforms.[39] The account architecture permits the Defendants to recognize subscribers across services and to administer bundled or cross-platform access.

81. The subscriber agreements, terms of use, and privacy policies for the services refer subscribers to Disney-controlled webpages and describe the relationship among Disney entities. On information and belief, those documents permit the Defendants to share responsibility for the services, subscriber data, platform technology, and content delivery.[40]

82. Disney+, Hulu, and the ESPN streaming services are marketed and sold together through bundle offerings. The bundle pages and checkout flows present the services as complementary parts of a single Disney subscription strategy and encourage subscribers to purchase access to more than one platform.[41]

---

[39] *See, e.g., Hulu Subscriber Agreement*, HULU (Feb. 5, 2026), https://www.hulu.com/subscriber_agreement.

[40] *Subscriber Agreement*, DISNEY+ (Feb. 5, 2026), https://www.disneyplus.com/legal/subscriber-agreement; *Hulu Subscriber Agreement*, HULU (Feb. 5, 2026), https://www.hulu.com/subscriber_agreement; *See generally* ESPN, https://plus.espn.com/; DISNEY+, https://www.disneyplus.com/; HULU, https://www.hulu.com/welcome.

[41] *See Disney Bundle*, DISNEY+, https://www.disneyplus.com/welcome/disney-hulu-espn-bundle ("The Hulu + Live TV plans include 95+ live TV channels and additional on-demand content from your favorite sports, entertainment, and news channels you can watch at home or on-the-go. You

83. On information and belief, the bundle arrangements cause a subscriber's use of one platform to increase the commercial value of the others. They also cause the Defendants to coordinate account access, billing, advertising, content presentation, and technical support for the services.[42]

84. On information and belief, the cross-promotion is planned and funded by the Defendants acting together. It drives users between services, increases the number of streams processed by the shared infrastructure, and encourages continued use of the coding and delivery systems at issue.

**B. AGENCY RELATIONSHIPS AMONG DEFENDANTS**

85. On information and belief, the Defendants use agency relationships to carry out streaming, distribution, technology, marketing, and subscriber-service functions on one another's behalf. Each agency relationship alleged below concerns the accused platforms and the activities through which video is prepared, coded, delivered, decoded, or monetized.

86. On information and belief, DMED acts as an agent of The Walt Disney Company in connection with The Walt Disney Company's streaming platform activities. DMED also acts as an agent of Disney DTC LLC, Disney Streaming Services LLC, and Disney Entertainment & Sports LLC when coordinating their platform functions.

87. On information and belief, DMED acts as an agent of BAMTech, LLC, Hulu, LLC, and ESPN, LLC in connection with the business, technology, distribution, and marketing activities of their respective platforms. DMED's enterprise coordination is performed for the benefit of those entities and under authority supplied by the Disney organization.

88. On information and belief, DMED's authority includes selecting priorities, assigning tasks,

---

will also get access to the content from Disney+, Hulu and ESPN+ streaming libraries. Access content from each service separately. Learn more and sign up here.") (linking to https://www.hulu.com/live-tv).

[42] *Id.*; ESPN, https://plus.espn.com/ ("Hulu + Live TV, DIRECTV, Fubo TV, Spectrum TV, Verizon FiOS, U-verse, and Cox customers may already get ESPN Unlimited as part of their pay-TV package. You will need to activate your ESPN plan and connect your MyDisney login.").

reviewing performance, and aligning the commercial and technical work of the other Defendants. When it performs those tasks for another Defendant, DMED acts subject to that Defendant's interests in operating and profiting from its streaming platform.

89. On information and belief, Disney DTC LLC acts as an agent of The Walt Disney Company and DMED in connection with their streaming platform activities. It also acts as an agent of Disney Streaming Services LLC and Disney Entertainment & Sports LLC when procuring infrastructure, planning content, coordinating the direct-to-consumer services, or implementing distribution and marketing plans.

90. On information and belief, Disney DTC LLC acts as an agent of BAMTech, LLC, Hulu, LLC, and ESPN, LLC in connection with the content, affiliate, cloud, CDN, subscriber-contracting, and distribution activities that support their platforms. Its contracting and procurement work, including negotiating content-distribution contracts and securing platform access, is undertaken for the benefit of the services operated by those entities.

91. On information and belief, Disney DTC LLC has authority to bind or commit the relevant Disney businesses and to negotiate with third parties on their behalf in arrangements involving media distribution, subscriber agreements, cloud capacity, delivery networks, affiliate programs, and marketing. In carrying out those assignments, it acts within the scope of agency granted by the entities whose services depend on those arrangements.

92. On information and belief, Disney Streaming Services LLC acts as an agent of The Walt Disney Company and DMED in connection with the finance and marketing of Disney+, Hulu, Hulu Live, and the ESPN streaming services. It acts as an agent of Disney DTC LLC and Disney Entertainment & Sports LLC when those activities are integrated with content and technology work.

93. On information and belief, Disney Streaming Services LLC acts as an agent of BAMTech,

LLC, Hulu, LLC, and ESPN, LLC in connection with platform promotion, budgeting, subscriber acquisition, and service launches. Its work is designed to advance the platform interests of those entities.

94. On information and belief, Disney Streaming Services LLC's personnel act with delegated authority when they set budgets, select promotional channels, assess subscriber growth, and coordinate marketing across the services. Those acts are performed for the account of the other Defendants that own, operate, or distribute the promoted platforms.

95. On information and belief, Disney Entertainment & Sports LLC acts as an agent of The Walt Disney Company and DMED in connection with the design and maintenance of their streaming technology. It also acts as an agent of Disney DTC LLC and Disney Streaming Services LLC when developing systems used for their content and subscriber programs.

96. On information and belief, Disney Entertainment & Sports LLC acts as an agent of BAMTech, LLC, Hulu, LLC, and ESPN, LLC in connection with the software, infrastructure, account, delivery, and playback services used by their platforms. Its engineers perform work for those entities even when the technology is deployed through a shared Disney system.

97. On information and belief, Disney Entertainment & Sports LLC receives requirements from the service businesses, converts those requirements into products and services, and maintains the resulting systems. That conduct is agency conduct because the technology is created and operated to accomplish the streaming objectives of the other Defendants.

98. On information and belief, BAMTech, LLC acts as an agent of The Walt Disney Company and DMED in connection with the technology used to operate their streaming products. It acts as an agent of Disney DTC LLC and Disney Streaming Services LLC when providing software, subscriber, and platform services for their direct-to-consumer offerings.

99. On information and belief, BAMTech, LLC acts as an agent of Disney Entertainment & Sports LLC in connection with the websites, applications, delivery services, and account systems used by the streaming platforms. It also acts as an agent of Hulu, LLC and ESPN, LLC in connection with the technology supporting Hulu, Hulu Live, and the ESPN streaming services.

100. On information and belief, BAMTech, LLC receives product requirements and operating direction from the Disney businesses whose services use its technology. Its development, maintenance, and support work is therefore performed on behalf of the other Defendants and within the scope of the assignments those Defendants provide.

101. On information and belief, Hulu, LLC acts as an agent of The Walt Disney Company and DMED in connection with the operation, marketing, and monetization of Hulu and Hulu Live. It acts as an agent of Disney DTC LLC and Disney Streaming Services LLC when carrying out content, finance, and promotional activities for those services.

102. On information and belief, Hulu, LLC acts as an agent of Disney Entertainment & Sports LLC in connection with the technology, CDN, cloud, affiliate, and distribution functions used for Hulu and Hulu Live. It also acts as an agent of BAMTech, LLC and ESPN, LLC when coordinating shared technology and bundle offerings.

103. On information and belief, Hulu, LLC operates the service in accordance with product, financial, technical, and distribution direction supplied by the Disney entities. Its platform conduct advances not only Hulu's interests but also the shared Disney subscription and advertising strategy.

104. On information and belief, ESPN, LLC acts as an agent of The Walt Disney Company and DMED in connection with the operation, finance, marketing, and monetization of the ESPN streaming services. It acts as an agent of Disney DTC LLC and Disney Streaming Services LLC when those entities support the ESPN streaming services' content, subscriber, or promotional

activities.

105. On information and belief, ESPN, LLC acts as an agent of Disney Entertainment & Sports LLC in connection with the technology, applications, delivery arrangements, and distribution contracts used for the ESPN streaming services. It also acts as an agent of BAMTech, LLC and Hulu, LLC when coordinating shared services and bundles.

106. On information and belief, ESPN, LLC conducts its work for the ESPN streaming services with authority delegated by the Disney entities and in coordination with the shared technology and distribution organizations. Its use of those delegated services advances the commercial objectives of each entity participating in the ESPN streaming services.

107. On information and belief, The Walt Disney Company also acts as an agent of DMED, Disney DTC LLC, Disney Streaming Services LLC, Disney Entertainment & Sports LLC, BAMTech, LLC, Hulu, LLC, and ESPN, LLC when its shared executives, corporate functions, facilities, and enterprise systems perform work for those entities. The parent thus provides services and direction on behalf of the subsidiaries in connection with the accused platforms.

108. On information and belief, the parent's agency work includes enterprise budgeting, executive supervision, legal and compliance coordination, procurement, technology planning, and communications. On information and belief, those services are furnished with the expectation that the subsidiaries will use them to operate and monetize their streaming services.

109. On information and belief, each of the agency relationships alleged above was material to the operation of at least one Disney platform. The Defendants acted through their agents to select and deploy the video technology, arrange delivery, attract subscribers, and generate revenue from the resulting streams.

110. On information and belief, no Defendant acted as a detached vendor with respect to the

accused platforms. On information and belief, each Defendant had authority to make decisions for, obtain services for, direct personnel for, or otherwise act on behalf of one or more of the other Defendants in connection with the streaming activities alleged here.

### C. VICARIOUS LIABILITY

111. On information and belief, the entities that control, supervise, or direct the streaming businesses retain the ability to determine how the accused platforms are designed and operated. Those controlling relationships are not nominal: they govern the services that process the video and generate the revenues at issue.

112. On information and belief, The Walt Disney Company controls DMED's streaming-related activities. It directs the objectives, resources, and structure of DMED's work for Disney+, Hulu, Hulu Live, and the ESPN streaming services, and it can require DMED to adopt or discontinue particular platform practices.

113. On information and belief, The Walt Disney Company conditions the benefits it gives DMED, including funding, personnel, shared services, and access to Disney content, on DMED's performance of the streaming functions. The parent also specifies the timing and manner in which DMED launches, changes, distributes, and promotes the platforms.

114. On information and belief, The Walt Disney Company profits from DMED's platform activities through the revenues and enterprise value created by subscriptions, advertising, distribution, and content consumption. The parent has the ability to stop or change DMED's use of the accused coding practices, but on information and belief has not done so.

115. On information and belief, because The Walt Disney Company controls DMED, receives the benefits of DMED's conduct, and can prevent the conduct, The Walt Disney Company is vicariously liable for DMED's infringing streaming activities and for the acts DMED directs through the other Defendants.

116. On information and belief, The Walt Disney Company controls Disney DTC LLC's content, marketing, contracting, and infrastructure-procurement work for the platforms. It directs the business priorities and may specify which content and delivery arrangements Disney DTC LLC uses.

117. On information and belief, The Walt Disney Company supplies Disney DTC LLC with the personnel, content access, funds, corporate systems, and commercial opportunities needed for its work. Those benefits are conditioned on carrying out the direct-to-consumer plans, including the timing and manner of the platforms' distribution and marketing.

118. On information and belief, The Walt Disney Company profits from the content and distribution activity performed by Disney DTC LLC and could direct that entity to discontinue the accused workflows or replace the associated technology. On information and belief, the parent has not exercised that ability.

119. On information and belief, The Walt Disney Company is therefore vicariously liable for Disney DTC LLC's infringing acts and for the infringing acts that Disney DTC LLC causes or enables through content distribution, cloud procurement, CDN arrangements, and affiliate operations.

120. On information and belief, The Walt Disney Company controls Disney Streaming Services LLC's finance and marketing work for all four platforms. It approves or sets the commercial goals that determine when and how the entity promotes subscriptions and bundles.

121. On information and belief, The Walt Disney Company provides Disney Streaming Services LLC with personnel, budgets, brand access, and enterprise marketing channels. Those benefits depend on the entity carrying out the parent's subscription-growth plans in the specified manner and on the specified schedule.

122. On information and belief, The Walt Disney Company profits from the subscriber growth

and platform use generated by Disney Streaming Services LLC, and it can stop or revise the entity's marketing of services that depend on the accused technology. On information and belief, the parent has allowed those activities to continue.

123. On information and belief, The Walt Disney Company is vicariously liable for Disney Streaming Services LLC's infringing platform activities because the parent controls the entity, benefits from its performance, and has retained the ability to direct or stop the relevant conduct.

124. On information and belief, The Walt Disney Company controls Disney Entertainment & Sports LLC's technology organization and its product-development priorities for Disney+, Hulu, Hulu Live, and the ESPN streaming services. The parent can specify the technical requirements, release schedule, and operational manner for the systems used by those platforms.

125. On information and belief, The Walt Disney Company furnishes Disney Entertainment & Sports LLC with engineers, funding, corporate systems, and access to the services whose technology it develops. Those benefits are conditioned on building and maintaining the infrastructure in the manner and at the times required by Disney's streaming businesses.

126. On information and belief, The Walt Disney Company profits from the technology that Disney Entertainment & Sports LLC builds and can require the entity to disable or redesign an infringing system. On information and belief, the parent has continued to permit the technology to be used across the services.

127. On information and belief, The Walt Disney Company is vicariously liable for Disney Entertainment & Sports LLC's infringing design, maintenance, and technology-support activities, including the use of shared back-end services in the accused platforms.

128. On information and belief, The Walt Disney Company controls BAMTech, LLC's technology work and can prescribe the products, priorities, and release timing for BAMTech systems

used by the streaming businesses. The parent also controls its participation in the ESPN streaming website and service architecture.

129. On information and belief, The Walt Disney Company provides BAMTech, LLC with funding, platform requirements, brand access, and business opportunities involving Disney+ and Hulu. Those benefits are tied to BAMTech's continued performance of technology and delivery work in the manner required by the Disney services.

130. On information and belief, The Walt Disney Company benefits from the streams and subscriptions enabled by BAMTech, LLC and can require BAMTech to stop or alter technology that uses the accused coding practices. On information and belief, the parent has not required BAMTech to do so.

131. On information and belief, The Walt Disney Company is vicariously liable for BAMTech, LLC's infringing development, maintenance, and platform-support activities, including work performed for Disney+ and the ESPN streaming services.

132. On information and belief, The Walt Disney Company controls Hulu, LLC's operation of Hulu and Hulu Live, including the resources, technology, content, and distribution arrangements used by those services. It can determine the timing and manner of Hulu's product, marketing, and streaming decisions.

133. On information and belief, The Walt Disney Company supplies Hulu, LLC with funding, personnel, content relationships, brand support, and shared technology. Those benefits are made available so Hulu, LLC will operate and promote Hulu and Hulu Live according to the parent company's platform plans.

134. On information and belief, The Walt Disney Company profits from Hulu and Hulu Live and can direct Hulu, LLC to stop using the infringing coding and delivery workflows. On information

and belief, the parent has not used that ability to prevent the conduct alleged in this Complaint.

135. On information and belief, The Walt Disney Company is vicariously liable for Hulu, LLC's infringing operation of Hulu and Hulu Live, including the use of shared technology and delivery infrastructure.

136. On information and belief, The Walt Disney Company controls ESPN, LLC's management, content, finance, marketing, and operation of the ESPN streaming services. It sets or approves the timing and manner in which the ESPN streaming services are presented, distributed, promoted, and supported.

137. On information and belief, The Walt Disney Company provides ESPN, LLC with content, personnel, funding, brand support, and access to the shared platform and distribution organizations. Those benefits are conditioned on ESPN, LLC's continued performance of activities relating to the ESPN streaming services on the schedule and through the systems selected by Disney.

138. On information and belief, The Walt Disney Company profits from subscriptions to the ESPN streaming services and related advertising and distribution and can order ESPN, LLC to discontinue the accused practices. On information and belief, it has not directed ESPN, LLC to stop using the relevant technology.

139. On information and belief, The Walt Disney Company is vicariously liable for ESPN, LLC's infringing management and operation of the ESPN streaming services, including the acts performed through the shared technology, account, and distribution systems.

140. On information and belief, DMED controls the platform-related work of Disney DTC LLC, Disney Streaming Services LLC, and Disney Entertainment & Sports LLC. It assigns responsibilities, coordinates their activities, and can determine the timing and manner in which those entities perform work for Disney+, Hulu, Hulu Live, and the ESPN streaming services.

141. On information and belief, DMED conditions funding, access to shared services, and business opportunities on the subsidiaries' performance of their assigned platform work. DMED receives the benefits of that work through the operating results, distribution reach, and subscriber growth of the services.

142. On information and belief, DMED can stop or redirect the subsidiaries' use of the accused technology and, on information and belief, has not done so. DMED is therefore vicariously liable for the infringing conduct of Disney DTC LLC, Disney Streaming Services LLC, and Disney Entertainment & Sports LLC.

143. On information and belief, DMED supervises Disney DTC LLC's content, affiliate, procurement, and cloud-related activities and directs how those activities support the services. DMED can require Disney DTC LLC to change or stop a delivery or coding workflow.

144. On information and belief, DMED benefits from Disney DTC LLC's content and infrastructure work and is vicariously liable for the resulting infringement because DMED directs that work, controls its manner and timing, and has not prevented its continuation.

145. On information and belief, DMED supervises Disney Streaming Services LLC's budgets and marketing programs and determines how those programs are deployed for the platforms. It can condition financial support and campaign resources on performance of the assigned activities.

146. On information and belief, DMED profits from the subscriber activity generated by Disney Streaming Services LLC and could require a change to the campaigns that promote the accused platforms. DMED is vicariously liable for Disney Streaming Services LLC's infringing finance and marketing conduct.

147. On information and belief, DMED supervises Disney Entertainment & Sports LLC's engineering roadmap, platform systems, and service releases. It may set the timing and manner of

development and can require the technology organization to maintain or replace a particular system.

148. On information and belief, DMED receives the operational and financial benefits of the technology maintained by Disney Entertainment & Sports LLC and can direct it to stop the accused uses. DMED is vicariously liable for Disney Entertainment & Sports LLC's infringing technology activities.

149. On information and belief, DMED supervises or coordinates the shared technology and platform work performed by BAMTech, LLC, Hulu, LLC, and ESPN, LLC. It can prescribe priorities, allocate resources, and specify the timing and manner of their streaming activities.

150. On information and belief, DMED receives the commercial and operational benefits of BAMTech, LLC's, Hulu, LLC's, and ESPN, LLC's work and can require those entities to stop using the accused technology. On information and belief, DMED has not exercised that authority and is vicariously liable for the resulting infringement.

151. On information and belief, Disney Streaming Services LLC receives the benefit of the subscriber growth and revenue generated by those entities and can direct a change to the marketing or finance practices that support the accused services. On information and belief, it has not done so and is vicariously liable for the related infringement.

152. On information and belief, Disney Entertainment & Sports LLC controls the technology work performed by BAMTech, LLC, Hulu, LLC, and ESPN, LLC when those entities use the shared streaming infrastructure. It specifies technical requirements, releases, and operating methods for the systems it builds or maintains.

153. On information and belief, Disney Entertainment & Sports LLC conditions access to its technology on the other entities' performance of their platform work and profits from the systems' continued use. It can disable or redesign a shared service, but on information and belief has not done

so.

154. On information and belief, Disney Entertainment & Sports LLC is vicariously liable for the infringing technology and platform-support conduct of BAMTech, LLC, Hulu, LLC, and ESPN, LLC performed through the shared systems.

155. On information and belief, ESPN, LLC controls or directs BAMTech, LLC's work on the ESPN streaming website and related subscriber technology. ESPN, LLC specifies the product requirements and timing for ESPN streaming service features and can require BAMTech to alter or stop the technical conduct.

156. On information and belief, ESPN, LLC conditions BAMTech, LLC's access to content from the ESPN streaming services, branding, and business opportunities on BAMTech's performance of the assigned development and maintenance work. ESPN, LLC profits from the resulting subscribers and streams.

157. On information and belief, ESPN, LLC can stop BAMTech, LLC's use of the accused technology and, on information and belief, has not done so. ESPN, LLC is therefore vicariously liable for BAMTech, LLC's infringing acts performed for the ESPN streaming services.

### D. INDUCEMENT

158. On information and belief, each Defendant affirmatively encourages conduct that causes the accused instrumentalities to be used. The inducement includes the coordination of entities whose systems process the video.

159. Defendants induce infringement by directing the encoding of video on cloud platforms such as AWS EC2, S3, Dynamo, and Kinesis. Ex. 11 (https://news.ycombinator.com/item?id=13541980). On information and belief, to the extent video is encoded and/or decoded on cloud platforms, Defendants explicitly direct the third-party operators of the cloud platforms to encode and/or decode video in an infringing manner, for example by

specifying encoder parameters and by instructing that the HEVC codec be used.

160. The Walt Disney Company induces the other Defendants by funding, directing, staffing, and coordinating the design, development, distribution, and operation of the accused platforms. It encourages those entities to perform the technical and commercial acts necessary to create and deliver the streams.

161. The Walt Disney Company induces infringement through bundle marketing and cross-promotion. In particular, subscription pathways for Disney+ and the ESPN streaming services direct users toward Hulu and the other services, causing the shared technology and coding workflows to be used for additional streams.






Ex. 12, https://www.disneyplus.com/welcome/disney-hulu-espn-bundle.

162. The Walt Disney Company has had notice of the Asserted Patents through at least November 7, 2025 and September 16, 2026 communications from Access Advance, as well as the communications and patent materials described in this Complaint. On information and belief, it has acted with knowledge of Plaintiffs' rights or with willful blindness to the fact that the induced acts use the claimed video-coding technology.

163. On information and belief, Disney Media and Entertainment Distribution LLC induces the other Defendants by assigning them platform responsibilities, funding their work, and coordinating the technology, content, sales, and delivery functions they perform. It affirmatively supports the acts that cause encoded video to be created and transmitted.

164. On information and belief, DMED induces infringement through bundle offers and cross-service placement. Its distribution pages and sales channels steer users among Disney+, Hulu, Hulu Live, and the ESPN streaming services, including by moving subscribers from one service's website to another's enrollment pathway.

165. On information and belief, DMED had notice of the Asserted Patents through the same notice

received by Disney and the other operating entities, or was willfully blind to Plaintiffs' patent rights. On information and belief, DMED nevertheless intended that the platforms and their service providers continue the induced acts.

166. On information and belief, Disney DTC LLC induces infringement by planning and managing content for Disney+ and Hulu, serving as a party to the Disney+, ESPN, and Hulu subscriber agreement, arranging access to programming, directing users to platform applications, and directing how the services are obtained and used. It encourages subscribers to stream through applications and connected devices that use the accused coding and delivery processes.

167. On information and belief, Disney DTC LLC induces the other Defendants by negotiating distribution contracts, procuring CDN and cloud services, and managing affiliate and third-party distribution operations. Those affirmative acts finance and facilitate the design and operation of the streaming systems.

168. On information and belief, Disney DTC LLC induces infringement through affiliate marketing and bundle placement that move subscribers among Disney+, Hulu, Hulu Live, and the ESPN streaming services. It directs or encourages users who begin on one service to enroll in another service that relies on the same or related coding systems.

169. On information and belief, Disney DTC LLC had notice of the Asserted Patents through the Disney enterprise's notice and licensing communications, or was willfully blind to Plaintiffs' rights. It nevertheless intended that its content and distribution activities cause the accused platform acts to continue.

170. On information and belief, Disney Streaming Services LLC induces the other Defendants by allocating budgets, financing campaigns, and coordinating the launch and operation of the platforms. It supports the design, development, and distribution decisions that place the accused technology

into service.

171. On information and belief, Disney Streaming Services LLC induces bundle use by marketing combined access to Disney+, Hulu, Hulu Live, and the ESPN streaming services and by directing customers between the services. Its campaigns encourage a subscriber's use of one platform to increase use of the others.

172. On information and belief, Disney Streaming Services LLC had notice of the Asserted Patents or was willfully blind to Plaintiffs' rights. On information and belief, it nevertheless intended that its own campaigns and the work of the other Defendants induce the infringing streaming acts.

173. On information and belief, Disney Entertainment & Sports LLC induces the other Defendants by developing, maintaining, and deploying the shared back-end services they use. It supplies the technology and coordinates releases that enable the other entities to operate the platforms and process encoded video.

174. On information and belief, Disney Entertainment & Sports LLC induces cross-use by building common functions that permit users to move among Disney+, Hulu, Hulu Live, and the ESPN streaming services. The common account, application, delivery, and playback features make the bundle and cross-promotion strategy effective.

175. On information and belief, Disney Entertainment & Sports LLC had notice of the Asserted Patents or was willfully blind to Plaintiffs' rights. Its continued development and maintenance of the shared platform systems was intended to support the induced acts.

176. On information and belief, BAMTech, LLC induces the other Defendants by building and maintaining technology they use to run the services, including subscriber systems, media catalogs, delivery connections, and playback tools. That work supports the design and operation of the platforms and the processing of encoded video.

177. On information and belief, BAMTech, LLC induces cross-use by supporting technology shared by Disney+, Hulu, Hulu Live, and the ESPN streaming services and by assisting in bundle and account functionality. Its systems help direct users toward additional services after they subscribe to one Disney offering.

178. On information and belief, BAMTech, LLC had notice of the Asserted Patents or was willfully blind to Plaintiffs' rights. On information and belief, it continued to develop and provide the technology with the intent that Disney entities perform the induced acts.

179. Hulu, LLC induces the other Defendants by operating Hulu and Hulu Live through shared content, cloud, CDN, account, and video-delivery systems. Its continued operation calls for the other entities to maintain the technology and services that process the accused streams.

180. Hulu, LLC induces cross-use by promoting bundles that include Disney+, Hulu, Hulu Live, and the ESPN streaming services. Its promotional pathways are intended to move customers into related services that use common or coordinated coding and delivery infrastructure.

## Hulu + Live TV plans

| Hulu + Live TV Plans* | Services | Price |
|---|---|---|
| Hulu + Live TV, Disney+, and ESPN Select | • Live TV<br>• Hulu (With Ads)<br>• Disney+ (With Ads)<br>• ESPN Select (With Ads) | Monthly: $99.99<br>Select plan |
| Hulu Premium + Live TV, Disney+ Premium, and ESPN Select | • Live TV<br>• Hulu (No Ads)<br>• Disney+ (No Ads)*<br>• ESPN Select (With Ads) | Monthly: $109.99<br>Select plan |

Ex. 13, https://help.hulu.com/article/hulu-how-much-does-hulu-cost#disney-plus-bundle-plans.

181. Hulu, LLC had notice of the Asserted Patents or was willfully blind to Plaintiffs' rights. On information and belief, it continued to operate and promote Hulu and Hulu Live with the intent that supporting entities perform the induced acts.

182. ESPN, LLC induces the other Defendants by supplying content plans, financing, marketing direction, and operating requirements for the ESPN streaming services. It coordinates with technology and distribution teams to keep the services active and to process sports video through the accused systems.

183. ESPN, LLC induces cross-service use by directing subscribers to the ESPN streaming services toward Disney+ and Hulu bundle offers and by accepting referrals from those platforms. Those referrals are intended to increase use of the same or related coding and delivery systems across

the Disney services.




Ex. 14, https://plus.espn.com/.

184. ESPN, LLC had notice of the Asserted Patents or was willfully blind to Plaintiffs' rights. On information and belief, it continued to operate and promote the ESPN streaming services with the intent that BAMTech and the other Defendants perform the induced acts.

185. On information and belief, each Defendant's inducement was undertaken with knowledge of the Asserted Patents, actual awareness of the patent allegations, or deliberate avoidance of confirming the technology's patent status. Each Defendant intended the platform conduct to occur and intended its customers or affiliates to use the systems in the manner alleged.

186. On information and belief, the Disney+ website induces infringement when it presents offers for Hulu and the ESPN streaming services alongside Disney+ subscription options and directs visitors to related enrollment pages. The resulting referrals encourage further use of the same family

of streaming systems.

187. On information and belief, the Hulu website induces infringement when it promotes bundles that include Disney+ and the ESPN streaming services and routes users to sign-up or account pages for those services. Hulu's customer-acquisition efforts thereby induce additional acts using coordinated video infrastructure.

188. On information and belief, the ESPN streaming website induces infringement when it directs subscribers toward Disney+ and Hulu bundles or displays those services as companion offerings. That conduct encourages a subscriber who has already requested content from the ESPN streaming services to request and receive additional accused streams.

189. On information and belief, the bundle checkout process induces infringement by consolidating payment, account authentication, and service activation while encouraging simultaneous use of multiple platforms. The integrated customer experience makes the induced streaming acts foreseeable and commercially desired.

190. On information and belief, the Defendants induce the cloud, CDN, content, and technology providers that support their platforms by selecting them, paying them, providing specifications, and directing how their services are integrated into the Disney streaming environment.

191. On information and belief, those provider-facing inducements are affirmative because the Defendants do more than purchase generic services: they specify the functions, interfaces, workflows, and delivery outcomes required for the accused platforms.

192. On information and belief, each Defendant understood that the platforms would be used repeatedly and at scale and that the resulting streams would depend on the coding and delivery processes described above.

193. On information and belief, the Defendants' shared employees and executives provide a

common source of instructions for the accused platform acts. Their cross-entity authority supports the inference that each Defendant intended and encouraged the conduct carried out through the others.

194. On information and belief, the Defendants had the ability to instruct customers, affiliates, and service providers to stop using a particular coding or delivery workflow, yet they continued to promote and support those workflows after receiving notice of Plaintiffs' rights.

195. On information and belief, the induced acts occur in the ordinary operation of the Disney platforms, not in a collateral or accidental use. The subscriptions, applications, shared systems, and technical services are designed to make the accused streaming activity continuous and repeatable.

196. The acts alleged in this section are affirmative steps that encourage direct infringement rather than mere passive ownership or receipt of revenue. The Defendants chose the products, services, commercial pathways, and technical arrangements that make the accused streaming activity possible.

### E. THE ITU'S COMMON PATENT POLICY

197. The International Telecommunication Union ("ITU") is a specialized agency of the United Nations responsible for coordinating global issues related to information and communication technologies. It was originally established in 1865 to manage international telegraph networks and has since evolved into a central body for modern telecommunications and digital infrastructure.

198. The ITU brings together governments, private companies, and technical experts to develop international standards, allocate radio spectrum, and improve global connectivity. One of its sectors, known as ITU-T, develops technical standards (called "Recommendations") to ensure global interoperability of communication systems.

199. One of the ITU-T's Recommendations is H.265, or High Efficiency Video Coding ("HEVC"). H.265 is a newer standard that provides more efficient coding than previous iterations.

200. The ITU has a Common Patent Policy regarding the contributions that are ultimately

included in a Recommendation and may be covered by one or more patent claims.

201. The ITU summarized its patent policy as follows:

> 1. The ITU Telecommunication Standardization Bureau (TSB), the ITU Radiocommunication Bureau (BR) and the offices of the CEOs of ISO and IEC are not in a position to give authoritative or comprehensive information about evidence, validity or scope of patents or similar rights, but it is desirable that the fullest available information should be disclosed. Therefore, any party participating in the work of ITU, ISO or IEC should, from the outset, draw the attention of the Director of ITU-TSB, the Director of ITU-BR, or the offices of the CEOs of ISO or IEC, respectively, to any known patent or to any known pending patent application, either their own or of other organizations, although ITU, ISO or IEC are unable to verify the validity of any such information.
>
> 2. If a Recommendation | Deliverable is developed and such information as referred to in paragraph 1 has been disclosed, three different situations may arise:
>
> 2.1 The patent holder is willing to negotiate licences free of charge with other parties on a non-discriminatory basis on reasonable terms and conditions. Such negotiations are left to the parties concerned and are performed outside ITU-T/ITU-R/ISO/IEC.
>
> 2.2 The patent holder is willing to negotiate licences with other parties on a non-discriminatory basis on reasonable terms and conditions. Such negotiations are left to the parties concerned and are performed outside ITU-T/ITU-R/ISO/IEC.
>
> 2.3 The patent holder is not willing to comply with the provisions of either paragraph 2.1 or paragraph 2.2; in such case, the Recommendation | Deliverable shall not include provisions depending on the patent.
>
> 3. Whatever case applies (2.1, 2.2 or 2.3), the patent holder has to provide a written statement to be filed at ITU-TSB, ITU-BR or the offices of the CEOs of ISO or IEC, respectively, using the appropriate "Patent Statement and Licensing Declaration" form. This statement must not include additional provisions, conditions, or any other exclusion clauses in excess of what is provided for each case in the corresponding boxes of the form.

Ex. 15 (Common Patent Policy), https://www.itu.int/en/ITU-T/ipr/Pages/policy.aspx.

202. According to the ITU's Guidelines for implementation of its patent policy, a declaration "declares the willingness to license in case part(s) or all of any proposals contained in contributions submitted by the organization are included in ITU-T Recommendation(s) and the included part(s) contain items that have been patented or for which patent applications have been filed and whose use would be required to implement ITU-T Recommendation(s)." Ex. 16 (Patent Policy Guidelines) at 3.

203. Plaintiffs are prepared to grant licenses for implementations of the H.265 Standard to any patent claims essential to the H.265 Standard on reasonable and non-discriminatory ("RAND") terms and conditions as set forth in the ITU Common Patent Policy.

### F. LICENSE OFFERS TO DISNEY

204. Patent pools are cooperative licensing arrangements where patent holders aggregate their

patents and license them collectively — through a single licensing framework — to one another or to third parties. By consolidating access to otherwise fragmented patent portfolios, patent pools reduce transaction costs, eliminate the need for licensees to negotiate separately with each individual patent holder, and allow for a single, aggregate royalty rate to be distributed equitably among pool members. These efficiencies promote the widespread adoption of technical standards, facilitate downstream innovation by lowering barriers to market entry, and encourage the diffusion of technology across industries, ultimately benefiting consumers through greater product interoperability, reduced costs, and increased competition.

205. Consistent with these market benefits, Plaintiffs offer licenses to their patents at reasonable rates through Access Advance's Video Distribution Patent ("VDP") pool, which includes the Asserted Patents as well as others. On information and belief, on December 17, 2024, Access Advance contacted Disney via e-mail to discuss the VDP pool. A confidentiality agreement was executed between the parties in February 2025. On information and belief, on February 10-11, 2025, Access Advance provided information about the program including a VDP Pool overview and a review copy of a license agreement, including terms and pricing of its VDP program.[43]

206. On information and belief, on November 7, 2025, Access Advance subsequently provided the VDP patent list, which is a chart identifying patents that are available to license through the VDP pool, including the Asserted Patents, and representative sections of the HEVC Standard to which those patents relate. On September 16, 2026, Access Advance sent Disney an updated patent list, which included the Asserted Patents.

207. Plaintiffs have offered a license to the Asserted Patents under reasonable and non-discriminatory terms through the VDP pool.

---

[43] https://accessadvance.com/vdp-pool-royalty/.

208. Since the December 17, 2024, e-mail, Access Advance continued negotiating. Disney did not accept the February 11, 2025, offer to license the VDP Pool and did not seek a bilateral license from any of the Plaintiffs for the Asserted Patents or any other patents practiced by Disney's video streaming systems and functionality.

209. Despite these efforts, Disney remains unlicensed. Disney has continued to use Plaintiffs' patented technology without paying any royalties.

210. Disney's continued unlicensed use of Plaintiffs' patents has prompted Plaintiffs to bring this action.

## PLAINTIFFS' ASSERTED PATENTS

### A. U.S. Patent No. 11,595,643

211. ETRI and Kyung Hee University own by assignment the entire right, title, and interest in and to U.S. Patent No. 11,595,643 (the "'643 Patent"). The '643 Patent, entitled "Encoding method and decoding method, and device using same," issued on February 28, 2023, to inventors Hui Yong Kim, Gwang Hoon Park, Kyung Yong Kim, Sung Chang Lim, Jin Ho Lee, Jin Soo Choi, and Jin Woong Kim. ETRI and Kyung Hee University own all rights to the '643 Patent necessary to bring this action, including the rights to recover for pre-suit infringement to the fullest extent under any provision of law, including 35 U.S.C. §§ 284-287. The '643 Patent issued from U.S. Patent Application No. 17/707,057, filed on March 29, 2022. A true and correct copy of the '643 Patent is attached as Exhibit 1 and incorporated by reference herein.

212. The U.S. Patent and Trademark Office also held in a re-examination proceeding that a claim, with certain overlapping scope to the exemplary claim of the '643 Patent referenced in this complaint, was valid, novel, and non-obvious over the prior art of record. *See* May 30, 2024 Re-Examination Decision finding validity of U.S. Patent No. 10,341,661.

213. The '643 Patent is not directed to merely an abstract idea or any patent-ineligible concept.

Instead, the ’643 Patent is directed to novel and unconventional improvements to the frequency transform and scanning of signals in the field of digital video coding. The ’643 Patent provides improvements over prior video coding techniques that result in substantial benefits to encoding and decoding efficiency, particularly for high-resolution video.

214. In video coding, pixel information includes a luma signal regarding luma and a chroma signal regarding chroma, and because the human sense of sight is more sensitive to luma, a luma signal and a chroma signal may be handled equally or differently. ’643 Patent, 1:44-48. Accordingly, a method of effectively handling a chroma signal and a luma signal separately was problematic. *Id*. at 1:49-50.

215. One technique used in video coding is intra prediction. Intra prediction generates a prediction block by performing spatial prediction using values of the pixels of an already encoded block neighboring a current block of pixels. *Id*. at 4:50-53.

216. To adjust the predicted block to better match the actual data, after intra prediction, the residual picture (the difference between the predicted block and the actual block) is subject to frequency-domain transform, quantization, and entropy encoding. *Id*. at 4:66-5:9. To increase entropy encoding efficiency, the resulting two-dimensional quantized coefficients are rearranged into a one-dimensional form. *Id*. at 8:64-67.

217. In the prior art, a zigzag scanning method was used to perform this rearrangement. *Id*. at 9:1-4. The prior zigzag approach, however, did not adapt the frequency transform—such as a Discrete Cosine Transform (DCT) or Discrete Sine Transform (DST)—to best match the particular circumstances of the coding. *Id*. at 9:4-7.

218. The ’643 Patent overcame these technical challenges by employing unconventional methods of adapting the frequency transform used. For example, the ’643 Patent teaches that in order to

increase encoding efficiency due to the frequency domain transform, integer transform, integer DCT, integer DST, or intra-prediction mode-dependent DCT/DST can be applied selectively and adaptively depending on the size of a block. *Id*. at 10:51-55. Furthermore, the ’643 Patent teaches that in some circumstances, integer DST may be applied in all horizontal and vertical directions other than a DC mode. *Id*. at 25:63-64. These unconventional choices improved encoding and decoding efficiency, improvements to the ability of computers to encode and decode video, and smaller video bitstreams.

219. The ’643 Patent therefore provides a specific technological improvement to the functionality and capabilities of video coding technology that results in increased encoding and decoding efficiency. For example, by deciding to use DST for all intra prediction direction modes when a size of the current block corresponds to 4×4 and the color component of the current block is luma, while using DCT in certain other circumstances, the encoding efficiency of the residual signals of both the luma and chroma signals are improved.

220. Conventional technology prior to the ’643 Patent was not capable of this efficiency, because it did not selectively adapt the frequency transform and scanning during coding. The ’643 Patent recognizes and solves these specific technological problems that plagued the conventional technology at the time. The ’643 Patent’s ability to adaptively select the transform type for luma and chroma based on the intra prediction mode was a significant advancement over existing technology.

221. The novel solution of the ’643 Patent was not well-understood, routine, or conventional, nor was it simply comprised of well-understood, routine, and conventional activities previously known to the industry. Furthermore, the combination of elements, including deriving an intra prediction mode of a current block; determining a scan type of the current block based on the intra prediction

mode; deriving residual coefficients based on the scan type; determining a transform type to be a DCT (Discrete Cosine Transform) or a DST (Discrete Sine Transform); and performing an inverse-transform on the residual coefficients based on the transform type, wherein when the size of the current block corresponds to 4×4 and the color component is a luma component, the inverse-transform is performed using DST in horizontal and vertical transform directions for all intra prediction direction modes and a planar mode, was not well-understood, routine, or conventional.

222. The unconventional nature and technological improvements of the ’643 Patent were recognized in the industry. For example, on or around April 16, 2012, a group including many of the inventors of the ’643 Patent submitted JCTVC-I0103, titled “Non-CE3: On scanIdxC derivation for chroma” to the Joint Collaborative Team on Video Coding (JCT-VC). Ex. 17. Further, on or around April 17, 2012, the same group submitted JCTVC-I0415, titled “Mode-dependent DCT/DST for chroma,” to JCT-VC. Ex. 18. Certain proposals from these submissions were ultimately adopted, based on their technical merits, in implementations of H.265 video coding such as those used by Disney today.

223. Plaintiffs complied with any applicable marking requirements under 35 U.S.C. § 287 as to the ’643 Patent at least because the asserted claims include method claims that do not require marking and/or there is nothing to mark.

**B. U.S. Patent No. 10,021,416**

224. ETRI owns by assignment the entire right, title, and interest in and to U.S. Patent No. 10,021,416 (the “’416 Patent”). The ’416 Patent, entitled “Method, apparatus, and bitstream for generating reconstructed blocks using filter for intra prediction mode,” issued on July 10, 2018, to inventors Jin Ho Lee, Hui Yong Kim, Sung Chang Lim, Jin Soo Choi, and Jin Woong Kim. ETRI owns all rights to the ’416 Patent necessary to bring this action, including the rights to recover for pre-suit infringement to the fullest extent under any provision of law including 35 U.S.C. §§ 284-

287. The ’416 Patent issued from U.S. Patent Application No. 15/069,314, filed on March 14, 2016. A true and correct copy of the ’416 Patent is attached as Exhibit 2 and incorporated by reference herein.

225. The ’416 Patent is not directed to merely an abstract idea or any patent-ineligible concept. Instead, the ’416 Patent is directed to novel and unconventional improvements to intra prediction and the filtering of prediction pixels in the field of digital video coding. The ’416 Patent provides improvements over prior intra prediction techniques that result in substantial benefits to coding efficiency, particularly for high-resolution and high-definition video.

226. In video coding, an intra predictor performs spatial prediction using the pixel values of already-encoded blocks around a current block to generate a prediction block. ’416 Patent at 8:13-16. A persistent problem with conventional intra prediction is that prediction error is generated at the time of intra prediction and discontinuities arise between blocks, which degrade prediction efficiency and encoding efficiency. *Id.* at 12:54-67. Conventional intra prediction techniques did not adequately address the prediction error and inter-block discontinuity that resulted from generating the prediction block, and a need existed for a higher-efficiency compression technology for higher-resolution and higher-definition images. *Id.*

227. The ’416 Patent overcame these technical challenges by employing an unconventional method of performing filtering, where the filter type applied to the filtering target pixel and the filtering target region are determined based on the intra prediction mode. *Id.* at 2:7-20. For the DC mode, the filtering target region includes the left vertical prediction pixel line at the leftmost portion and the upper horizontal prediction pixel line at the uppermost portion of the prediction block. *Id.* at 2:21-27. The filter shape, filter tap, and filter coefficients for the DC mode are fixed for a plurality of block sizes. *Id.* at 2:33-37. Further, the ’416 Patent teaches selectively using the particular filter

for block sizes smaller than 32×32 because at this size the "correlation between pixels neighboring to the current block and/or pixels in the current block may be large" and in "this case, the filtering on the prediction block does not have an important meaning." *Id*. at 40:17-63, 47:55-65 (claim 3).

228. The '416 Patent therefore provides a specific technological improvement to the functionality and capabilities of video coding technology that results in reduced prediction error and minimized discontinuity between blocks, thereby improving prediction efficiency and encoding efficiency. For example, by filtering specific prediction pixels along the block boundaries according to the intra prediction mode, the patent reduces the prediction error generated during intra prediction and the discontinuity at block boundaries. *Id*. at 12:54-13:9. Because the prediction error is reduced and the discontinuity between the blocks is minimized, the invention makes it possible to improve the encoding/decoding efficiency, which results in the ability to represent high-quality videos with smaller video bitstreams. *Id*.

229. Conventional technology prior to the '416 Patent was not capable of this improvement, because it did not perform intra-prediction-mode-dependent filtering of prediction pixels to reduce prediction error and inter-block discontinuity. The '416 Patent recognizes and solves these specific technological problems that plagued the conventional technology at the time. The '416 Patent's ability to filter prediction pixels with a filter type and region determined by the intra prediction mode, using a filter with a filter shape, filter tap, and filter coefficients that are fixed for a plurality of block sizes, was a significant advancement over existing technology.

230. The novel solution of the '416 Patent was not well-understood, routine, or conventional, nor was it simply comprised of well-understood, routine, and conventional activities previously known to the industry. Furthermore, the combination of elements, including determining an intra prediction mode for a current block; generating a prediction block by performing intra prediction for a DC

mode; and generating a reconstructed block based on the prediction block and a reconstructed residual block, wherein performing the intra prediction for the DC mode comprises generating prediction values of filtered prediction pixels using a filter for the DC mode and pixel values of reconstructed reference pixels adjacent to the current block, the filtered prediction pixels being one or more pixels located in a vertical pixel line at the leftmost side and a horizontal pixel line at the uppermost side of the prediction block, and a filter shape, filter tap, and plurality of filter coefficients of the filter for the DC mode being fixed for a plurality of block sizes, was not well-understood, routine, or conventional.

231. The unconventional nature and technological improvements of the ’416 Patent were recognized in the industry. For example, on or around July 1, 2011, a group including many of the inventors of the ’416 Patent submitted JCTVC-F358, titled “Mode dependent filtering for intra predicted sample,” to the Joint Collaborative Team on Video Coding (JCT-VC). Ex. 19. Certain proposals from this submission were ultimately adopted, based on their technical merits, in implementations of H.265 video coding such as those used by Disney today, and referenced in later JCT-VC submissions such as JCTVC-F649, titled “Cross-check of ETRI’s proposal (JCTVC-F358) on mode dependent filtering for intra predicted samples.” Ex. 20.

232. ETRI complied with any applicable marking requirements under 35 U.S.C. § 287 as to the ’416 Patent at least because the asserted claims include method claims that do not require marking and/or there is nothing to mark.

**C. U.S. Patent No. 10,194,168**

233. ETRI and KAU own by assignment the entire right, title, and interest in and to U.S. Patent No. 10,194,168 (the “’168 Patent”). The ’168 Patent, entitled “Method for inducing prediction motion vector and apparatuses using same,” issued on January 29, 2019, to inventors Sung Chang Lim, Hui Yong Kim, Jin Ho Lee, Jin Soo Choi, Jin Woong Kim, Jae Gon Kim, Sang Yong Lee, and

Un Ki Park. ETRI and KAU own all rights to the ’168 Patent necessary to bring this action, including the rights to recover for pre-suit infringement to the fullest extent under any provision of law including 35 U.S.C. §§ 284-287. The ’168 Patent issued from U.S. Patent Application No. 15/244,579, filed on August 23, 2016. A true and correct copy of the ’168 Patent is attached as Exhibit 3 and incorporated by reference herein.

234. The ’168 Patent is not directed to merely an abstract idea or any patent-ineligible concept. Instead, the ’168 Patent is directed to novel and unconventional improvements to the derivation and construction of candidate prediction motion vector lists used in inter-frame prediction in the field of digital video coding. The ’168 Patent provides improvements over prior candidate prediction motion vector list construction techniques that result in substantial benefits to the computational efficiency of video encoding and decoding.

235. In video coding, inter-frame prediction predicts pixel values in a current picture from a previous or subsequent picture using motion vectors. ’168 Patent, 1:41-50. To identify an optimal prediction motion vector for a prediction target block, a candidate prediction motion vector list is constructed from spatial candidate prediction motion vectors derived from neighboring prediction blocks and a temporal candidate prediction motion vector derived from a collocated block in a reference picture. ’168 Patent, 8:44-54, 17:29-31, FIGS. 3-5 and accompanying text. The candidate prediction motion vector list is then used to select the prediction motion vector for the prediction target block. ’168 Patent, 9:17-21, 10:4-10:8.

236. In the prior art, however, the process of determining whether to derive a temporal candidate prediction motion vector was performed without considering the results of deriving the spatial candidate prediction motion vectors. As a result, the temporal candidate prediction motion vector derivation process was performed even when it was not needed, resulting in unnecessary

computational complexity during video encoding and decoding.

237. The ’168 Patent overcame these technical challenges by employing an unconventional method of determining temporal candidate prediction motion vector information based on spatial candidate prediction motion vector information. Specifically, when both the first spatial candidate prediction motion vector and the second spatial candidate prediction motion vector are available and different from each other, the ’168 Patent determines the temporal candidate prediction motion vector availability information such that the temporal candidate prediction motion vector is unavailable. This eliminates unnecessary derivation of the temporal candidate prediction motion vector when sufficient distinct spatial candidate prediction motion vectors already fill the candidate prediction motion vector list. ’168 Patent, 28:58-29:11, 33:24-34:4, 35:61-36:30, 38:55-64; FIGS. 14, 20; Claims 1, 4.

238. The ’168 Patent therefore provides a specific technological improvement to the functionality and capabilities of video coding technology that reduces the computational complexity of constructing the candidate prediction motion vector list. By conditionally skipping the temporal candidate prediction motion vector derivation when two distinct spatial candidate prediction motion vectors are already available, the ’168 Patent enables more efficient encoding and decoding with reduced processing overhead.

239. Conventional technology prior to the ’168 Patent was not capable of this efficiency, because it did not adaptively determine whether to derive the temporal candidate prediction motion vector based on the spatial candidate prediction motion vector information. The ’168 Patent recognizes and solves this specific technological problem with the conventional technology at the time. The ’168 Patent’s ability to determine temporal candidate prediction motion vector availability based on whether two available spatial candidate prediction motion vectors are different from each other, and

thereby avoid unnecessary temporal candidate prediction motion vector derivation, was a significant advancement over existing technology. ’168 Patent, FIGS. 14 and 20 and accompanying text.

240. The novel solution of the ’168 Patent was not well-understood, routine, or conventional, nor was it simply comprised of well-understood, routine, and conventional activities previously known to the industry. Furthermore, the combination of elements, including generating a candidate prediction motion vector list by determining information on a plurality of spatial candidate prediction motion vectors from a neighboring prediction block to a prediction target block and determining information on a temporal candidate prediction motion vector based on the information on the plurality of spatial candidate prediction motion vectors; and encoding information on a prediction motion vector used to perform inter prediction on the prediction target block among candidate prediction motion vectors comprised in the candidate prediction motion vector list, wherein, in response to both the first spatial candidate prediction motion vector and the second spatial candidate prediction motion vector being available and the first spatial candidate prediction motion vector and the second spatial candidate prediction motion vector being different from each other, the temporal candidate prediction motion vector availability information is determined such that the temporal candidate prediction motion vector is unavailable, was not well-understood, routine, or conventional. ’168 Patent, Claims 1, 4.

241. The unconventional nature and technological improvements of the ’168 Patent were recognized in the industry. For example, the ideas in the ’168 Patent were rapidly adopted into the draft for the H.265 standard. *E.g.* Ex. 21 (JCTVC-G1103-v8) at 106. These concepts were ultimately adopted, based on their technical merits, in implementations of H.265 video coding such as those used by Disney today.

242. Plaintiffs complied with any applicable marking requirements under 35 U.S.C. § 287 as to

the ’168 Patent at least because the asserted claims include method claims that do not require marking and/or there is nothing to mark.

**D. U.S. Patent No. 10,742,996**

243. ETRI, Kyung Hee University, and Kwangwoon University own by assignment the entire right, title, and interest in and to U.S. Patent No. 10,742,996 (the "’996 Patent"). The ’996 Patent, entitled "Image encoder and decoder using unidirectional prediction," issued on August 11, 2020, to inventors Hae Chul Choi, Se Yoon Jeong, Sung-chang Lim, Jin Soo Choi, Jin Woo Hong, Dong Gyu Sim, Seoung-Jun Oh, Chang-Beom Ahn, Gwang Hoon Park, Seung Ryong Kook, Sea-Nae Park, and Kwang-Su Jeong.

244. ETRI, Kyung Hee University, and Kwangwoon University own all rights to the ’996 Patent necessary to bring this action, including the rights to recover for pre-suit infringement to the fullest extent under any provision of law including 35 U.S.C. §§ 284-287. The ’996 Patent issued from U.S. Patent Application No. 16/388,382, filed on April 18, 2019. A true and correct copy of the ’996 Patent is attached as Exhibit 4 and incorporated by reference herein.

245. The ’996 Patent is not directed to merely an abstract idea or any patent-ineligible concept. Instead, the ’996 Patent is directed to novel and unconventional improvements to the encoding and decoding order of sub-blocks based on an intra prediction mode in the field of digital video coding. The ’996 Patent provides improvements over prior intra prediction encoding techniques that result in substantial benefits to prediction accuracy and encoding efficiency.

246. In video coding, intra prediction generates a prediction image using reference pixels at the periphery of sub-blocks within a macro block, and encodes the difference between the prediction image and the actual image. ’996 Patent, 3:51-57. In conventional techniques such as those in the H.264 Standard, each sub-block within a macro block was encoded in a fixed order without regard to the intra prediction mode. ’996 Patent, FIG. 4 and accompanying text.

247. In the prior art, the encoding and decoding order of sub-blocks was determined without considering the prediction mode. '996 Patent, 6:64-7:5. As a result, when certain directional prediction modes were applied, the distance between a sub-block intended to be encoded and its reference pixel could be significantly large, causing a substantial difference between the value of the reference pixel and the value of the pixel to be encoded. *Id*. at 7:6-15, 6:33-41. This large distance degraded prediction accuracy and reduced encoding efficiency. *Id*.

248. The '996 Patent overcame these technical challenges by employing an unconventional method of determining the encoding and decoding order of sub-blocks based on the intra prediction mode. Specifically, the '996 Patent teaches determining the decoding order so that a sub-block including a reference pixel is encoded prior to the sub-block intended to be encoded. '996 Patent, 7:16-22. For example, when a diagonal down-left direction is applied as the prediction mode, the sub-blocks are reordered so that the top-right sub-block is decoded before the top-left sub-block, and the bottom-right sub-block is decoded before the bottom-left sub-block. *Id.*, 6:42-49, 7:16-30. This ensures that each sub-block is decoded with reference to pixels from an already-decoded adjacent block, reducing the distance between the reference pixel and the pixel to be decoded. *Id.*, 6:50-56.

249. The '996 Patent therefore provides a specific technological improvement to the functionality and capabilities of video coding technology that results in improved prediction accuracy and encoding efficiency. Because the sub-block including the reference pixel is encoded prior to the sub-block to be encoded, the distance between the reference pixel and the pixel to be encoded is reduced, leading to smaller prediction errors and more efficient encoding and decoding. '996 Patent, 6:50-56.

250. Conventional technology prior to the '996 Patent was not capable of this improvement, because it determined the encoding and decoding order of sub-blocks without considering the prediction mode. The '996 Patent recognizes and solves this specific technological problem with the

conventional technology at the time. The ’996 Patent’s ability to adaptively determine the decoding order of sub-blocks based on the intra prediction mode, so that each sub-block is decoded with reference to an already-decoded adjacent sub-block, was a significant advancement over existing technology.

251. The novel solution of the ’996 Patent was not well-understood, routine, or conventional, nor was it simply comprised of well-understood, routine, and conventional activities previously known to the industry. Furthermore, the combination of elements, including obtaining intra prediction mode information indicating an intra prediction mode; determining a decoding order among the plurality of the sub-blocks in the block based on the intra prediction mode; and decoding the plurality of the sub-blocks in the block based on the decoding order, wherein a width of the block is equal to a height of the block, and a width of a sub-block of the plurality of the sub-blocks is equal to a height of the sub-block, was not well-understood, routine, or conventional.

252. The unconventional nature and technological improvements of the ’996 Patent were recognized in the industry. For example, on or around October 6, 2008, a group including many of the inventors of the ’996 Patent submitted VCEG input document VCEG-AJ16, titled “Unidirectional 4x4 intra prediction,” to the ITU-T Video Coding Experts Group (VCEG). Ex. 22. Certain proposals from this submission were ultimately adopted, based on their technical merits, in implementations of video coding standards such as those used by Disney today.

253. Plaintiffs complied with any applicable marking requirements under 35 U.S.C. § 287 as to the ’996 Patent at least because the asserted claims include method claims that do not require marking and/or there is nothing to mark.

**E. U.S. Patent No. 10,003,820**

254. ETRI owns by assignment the entire right, title, and interest in and to U.S. Patent No. 10,003,820 (the “’820 Patent”). The ’820 Patent, entitled “Image encoding/decoding method and

apparatus for same," issued on June 19, 2018, to inventors Jin Ho Lee, Hui Yong Kim, Sung Chang Lim, Jin Soo Choi, and Jin Woong Kim. ETRI owns all rights to the '820 Patent necessary to bring this action, including the rights to recover for pre-suit infringement to the fullest extent under any provision of law including 35 U.S.C. §§ 284-287. The '820 Patent issued from U.S. Patent Application No. 15/070,155, filed on March 15, 2016. A true and correct copy of the '820 Patent is attached as Exhibit 5 and incorporated by reference herein.

255. The '820 Patent is not directed to merely an abstract idea or any patent-ineligible concept. Instead, the '820 Patent is directed to novel and unconventional improvements to intra prediction and the filtering of prediction pixels in the field of digital video coding. The '820 Patent provides improvements over prior intra prediction techniques that result in substantial benefits to coding efficiency, particularly for high-resolution and high-definition video.

256. In video coding, an intra predictor performs spatial prediction using the pixel values of already-encoded blocks around a current block to generate a prediction block. '820 Patent at 8:1-4. A persistent problem with conventional intra prediction is that prediction error is generated at the time of intra prediction and discontinuities arise between blocks, which degrade prediction efficiency and encoding efficiency. *Id*. at 12:44-54. Conventional intra prediction techniques did not adequately address the prediction error and inter-block discontinuity that resulted from generating the prediction block, and a need existed for a higher-efficiency compression technology for higher-resolution and higher-definition images. *Id*.

257. The '820 Patent overcame these technical challenges by employing an unconventional method of performing filtering, where the filter type applied to the filtering target pixel and the filtering target region are determined based on the intra prediction mode. *Id*. at 1:66-2:11. For the DC mode, the filtering target region includes the left vertical prediction pixel line at the leftmost

portion and the upper horizontal prediction pixel line at the uppermost portion of the prediction block. *Id*. at 2:12-18. The filter shape, filter tap, and filter coefficients for the DC mode are fixed for a plurality of block sizes. *Id*. at 2:24-28. Further, the '820 Patent teaches selectively using the particular filter for block sizes smaller than 32×32 because at this size the "correlation between pixels neighboring to the current block and/or pixels in the current block may be large" and in "this case, the filtering on the prediction block does not have an important meaning." *Id*. at 40:3-55.

258. The '820 Patent also teaches the use of a specific type of 3-tap filter where a filter coefficient allocated to a filter tap corresponding to the value derived by the DC mode is 2/4, a filter coefficient allocated to a filter tap corresponding to an upper reference pixel is 1/4, and a filter coefficient allocated to a filter tap corresponding to a left reference pixel is 1/4. *Id*. at 2:29-44, 28:62-29:9. This allows a smoother prediction for the upper left pixel in a prediction block, and keeping these coefficients fixed across block sizes results in a simpler encoding process.

259. The '820 Patent therefore provides a specific technological improvement to the functionality and capabilities of video coding technology that results in reduced prediction error and minimized discontinuity between blocks, thereby improving prediction efficiency and encoding efficiency. For example, by filtering specific prediction pixels along the block boundaries according to the intra prediction mode, the patent reduces the prediction error generated during intra prediction and the discontinuity at block boundaries. *Id*. at 12:41-54. Because the prediction error is reduced and the discontinuity between the blocks is minimized, the invention makes it possible to improve the encoding/decoding efficiency, which results in the ability to represent high-quality videos with smaller video bitstreams. *Id*.

260. Conventional technology prior to the '820 Patent was not capable of this improvement, because it did not perform intra-prediction-mode-dependent filtering of prediction pixels to reduce

prediction error and inter-block discontinuity. The '820 Patent recognizes and solves these specific technological problems that plagued the conventional technology at the time. The '820 Patent's ability to filter prediction pixels with a filter type and region determined by the intra prediction mode, using a filter with a filter shape, filter tap, and filter coefficients that are fixed for a plurality of block sizes, was a significant advancement over existing technology.

261. The novel solution of the '820 Patent was not well-understood, routine, or conventional, nor was it simply comprised of well-understood, routine, and conventional activities previously known to the industry. Furthermore, the combination of elements, including generating a prediction block by performing intra prediction on a current block for a DC mode; and generating a reconstructed block based on the prediction block and a reconstructed residual block corresponding to the current block, wherein prediction values of filtered prediction pixels of the prediction block are generated using a filter for the DC mode during the intra prediction, the filtered prediction pixels are one or more pixels located in a vertical pixel line at a leftmost side of the prediction block and one or more pixels located in a horizontal pixel line at an uppermost side of the prediction block, a prediction value of a leftmost and uppermost filtered prediction pixel among the filtered prediction pixels is generated using a 3-tap filter based on a value derived by the DC mode, the filter has a predetermined fixed filter shape, a filter tap and filter coefficients regardless of a size of the current block, and in the 3-tap filter, a filter coefficient allocated to a filter tap corresponding to the value derived by the DC mode is 2/4, a filter coefficient allocated to a filter tap corresponding to an upper reference pixel is 1/4, and a filter coefficient allocated to a filter tap corresponding to a left reference pixel is 1/4, was not well-understood, routine, or conventional.

262. The unconventional nature and technological improvements of the '820 Patent were recognized in the industry. For example, on or around July 1, 2011, a group including many of the

inventors of the '820 Patent submitted JCTVC-F358, titled "Mode dependent filtering for intra predicted sample," to the Joint Collaborative Team on Video Coding (JCT-VC). Ex. 19. Certain proposals from this submission were ultimately adopted, based on their technical merits, in implementations of H.265 video coding such as those used by Disney today, and referenced in later JCT-VC submissions such as JCTVC-F649, titled "Cross-check of ETRI's proposal (JCTVC-F358) on mode dependent filtering for intra predicted samples." Ex. 20.

263. ETRI complied with any applicable marking requirements under 35 U.S.C. § 287 as to the '820 Patent at least because the asserted claims include method claims that do not require marking and/or there is nothing to mark.

**COUNT I: PATENT INFRINGEMENT OF THE '643 PATENT**

264. Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

265. Disney had knowledge and notice of the '643 Patent at least by November 7, 2025, and again through communications on September 16, 2026, and the filing of this complaint.

266. Disney infringes the '643 Patent by, for example, making, using, selling, offering for sale, and/or importing in the United States apparatuses and/or methods covered by one or more claims of the '643 Patent and thus directly infringes the '643 Patent literally and/or under the Doctrine of Equivalents, in violation of 35 U.S.C. § 271. For example, Disney directly infringes the '643 Patent through its encoding of bitstreams into H.265-compliant (HEVC) formats on servers in the United States.

267. On information and belief, Disney indirectly infringes claims of the '643 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Disney's partners and vendors in this District and elsewhere in the United States. For example, on information and belief, as a result of Disney's inducement, service providers directly infringe the '643 Patent. Disney has performed and continues to perform these affirmative acts with knowledge of the '643 Patent and with the

intent, or willful blindness, that the induced acts directly infringe the ’643 Patent.

268. Upon information and belief, Disney derives revenue, directly and indirectly, from the activities relating to the Accused Services and to infringement of the ’643 Patent, including in this District and elsewhere in the United States.

269. Disney’s infringement of the ’643 Patent is willful and deliberate. As detailed above, Disney had knowledge of the ’643 Patent and had knowledge, or was willfully blind, as to its infringement of the ’643 Patent. As discussed above, Disney has had actual knowledge of the ’643 Patent since at least November 7, 2025, when Access Advance notified Disney of the patent. Further, as discussed above, Disney knew or should have known that its actions infringe and actively induce infringement of the ’643 Patent. As discussed above, Disney specifically intended that both itself and/or its service providers infringe the ’643 Patent.

270. Disney’s infringement of the ’643 Patent has damaged and will continue to damage Plaintiffs.

271. Exemplary claim 2 of the ’643 Patent recites:

> 2. A method for encoding a video signal, comprising:
>
> deriving an intra prediction mode of a current block;
>
> determining a scan type of the current block based on the intra prediction mode of the current block;
>
> deriving residual coefficients of the current block based on the scan type of the current block;
>
> determining a transform type of the current block to be a DCT (Discrete Cosine Transform) or a DST (Discrete Sine Transform); and
>
> performing an inverse-transform on the residual coefficients based on the transform type,
>
> wherein when a size of the current block corresponds to 4×4 and a color component of the current block is a luma component, the inverse-transform is performed by using DST in horizontal and vertical transform directions, for all intra prediction direction mode and a planar mode of the current block.

272. Disney’s Accused Services perform the method of exemplary Claim 2 of the ’643 Patent. An exemplary claim chart is attached as Exhibit 6 and is incorporated by reference herein.

273. Plaintiffs are entitled to all rights to recover for present, past, and future infringement for the ’643 Patent. Plaintiffs are entitled to recover to the full extent allowable under 35 U.S.C. §§ 284-287, including for up to six years prior to the filing of this complaint. There is no marking issue under 35 U.S.C. § 287 or otherwise which would limit damages, and Plaintiffs have complied with all relevant statutes for maximum recovery under the law.

**COUNT II: PATENT INFRINGEMENT OF THE ’416 PATENT**

274. Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

275. Disney had knowledge and notice of the ’416 Patent at least by November 7, 2025, and again through communications on September 16, 2026, and the filing of this complaint.

276. Disney infringes the ’416 Patent by, for example, making, using, selling, offering for sale, and/or importing in the United States apparatuses and/or methods covered by one or more claims of the ’416 Patent and thus directly infringes the ’416 Patent literally and/or under the Doctrine of Equivalents, in violation of 35 U.S.C. § 271. For example, Disney directly infringes the ’416 Patent through its encoding of bitstreams into H.265-compliant (HEVC) formats on servers in the United States.

277. On information and belief, Disney indirectly infringes claims of the ’416 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Disney’s partners and vendors in this District and elsewhere in the United States. For example, on information and belief, as a result of Disney’s inducement, service providers directly infringe the ’416 Patent. Disney has performed and continues to perform these affirmative acts with knowledge of the ’416 Patent and with the intent, or willful blindness, that the induced acts directly infringe the ’416 Patent.

278. Upon information and belief, Disney derives revenue, directly and indirectly, from the activities relating to the Accused Services and to infringement of the ’416 Patent, including in this District and elsewhere in the United States.

279. Disney's infringement of the '416 Patent is willful and deliberate. As detailed above, Disney had knowledge of the '416 Patent and had knowledge, or was willfully blind, as to its infringement of the '416 Patent. As discussed above, Disney has had actual knowledge of the '416 Patent since at least November 7, 2025, when Access Advance notified Disney of the patent. Further, as discussed above, Disney knew or should have known that its actions infringe and actively induce infringement of the '416 Patent. As discussed above, Disney specifically intended that both itself and/or its service providers infringe the '416 Patent.

280. Disney's infringement of the '416 Patent has damaged and will continue to damage Plaintiffs.

281. Exemplary claim 1 of the '416 Patent recites:

> 1. A method of generating a reconstructed block, the method comprising:
>
> determining an intra prediction mode for a current block;
>
> generating a prediction block by performing intra prediction on the current block for a DC mode in response to the determined intra prediction mode being the DC mode; and
>
> generating the reconstructed block based on the prediction block and a reconstructed residual block corresponding to the current block,
>
> wherein the performing of the intra prediction on the current block for the DC mode comprises generating prediction values of filtered prediction pixels of the prediction block using a filter for the DC mode using pixel values of reconstructed reference pixels that are adjacent to the current block,
>
> the filtered prediction pixels of the prediction block are one or more pixels located in a vertical pixel line inside the prediction block at a leftmost side of the prediction block, and one or more pixels located in a horizontal pixel line inside the prediction block at an uppermost side of the prediction block, and
>
> a filter shape, filter tap, and a plurality of filter coefficients of the filter for the DC mode are fixed for a plurality of block sizes of the current block.

282. Disney's Accused Services perform the method of exemplary Claim 1 of the '416 Patent. An exemplary claim chart is attached as Exhibit 7 and is incorporated by reference herein.

283. ETRI is entitled to all rights to recover for present, past, and future infringement for the '416 Patent. ETRI is entitled to recover to the full extent allowable under 35 U.S.C. §§ 284-287, including

for up to six years prior to the filing of this complaint. There is no marking issue under 35 U.S.C. § 287 or otherwise which would limit damages, and ETRI has complied with all relevant statutes for maximum recovery under the law.

**COUNT III: PATENT INFRINGEMENT OF THE '168 PATENT**

284. Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

285. Disney had knowledge and notice of the '168 Patent at least by November 7, 2025, and again through communications on September 16, 2026, and the filing of this complaint.

286. Disney infringes the '168 Patent by, for example, making, using, selling, offering for sale, and/or importing in the United States apparatuses and/or methods covered by one or more claims of the '168 Patent and thus directly infringes the '168 Patent literally and/or under the Doctrine of Equivalents, in violation of 35 U.S.C. § 271. For example, Disney directly infringes the '168 Patent through its encoding and/or decoding of bitstreams in H.265-compliant (HEVC) formats on servers in the United States.

287. On information and belief, Disney indirectly infringes claims of the '168 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Disney's partners and vendors in this District and elsewhere in the United States. For example, on information and belief, as a result of Disney's inducement, service providers directly infringe the '168 Patent. Disney has performed and continues to perform these affirmative acts with knowledge of the '168 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '168 Patent.

288. Upon information and belief, Disney derives revenue, directly and indirectly, from the activities relating to the Accused Services and to infringement of the '168 Patent, including in this District and elsewhere in the United States.

289. Disney's infringement of the '168 Patent is willful and deliberate. As detailed above, Disney had knowledge of the '168 Patent and had knowledge, or was willfully blind, as to its infringement

of the ’168 Patent. As discussed above, Disney has had actual knowledge of the ’168 Patent since at least November 7, 2025, when Access Advance notified Disney of the patent. Further, as discussed above, Disney knew or should have known that its actions infringe and actively induce infringement of the ’168 Patent. As discussed above, Disney specifically intended that both itself and/or its service providers infringe the ’168 Patent.

290. Disney’s infringement of the ’168 Patent has damaged and will continue to damage Plaintiffs.

291. Exemplary claim 4 of the ’168 Patent recites:

> 4. A video encoding method comprising:
>
> generating a candidate prediction motion vector list by determining information on a plurality of spatial candidate prediction motion vectors from a neighboring prediction block to a prediction target block and determining information on a temporal candidate prediction motion vector based on the information on the plurality of spatial candidate prediction motion vectors; and
>
> encoding information on a prediction motion vector used to perform inter prediction on the prediction target block among candidate prediction motion vectors comprised in the candidate prediction motion vector list, wherein
>
> the information on the plurality of spatial candidate prediction motion vectors comprises at least one of first spatial candidate prediction motion vector availability information and a first spatial candidate prediction motion vector and at least one of second spatial candidate prediction motion vector availability information and a second spatial candidate prediction motion vector,
>
> the information on the temporal candidate prediction motion vector comprises at least one of temporal candidate prediction motion vector availability information and the temporal candidate prediction motion vector, and
>
> in response to both the first spatial candidate prediction motion vector and the second spatial candidate prediction motion vector being available and the first spatial candidate prediction motion vector and the second spatial candidate prediction motion vector being different from each other, the temporal candidate prediction motion vector availability information is determined such that the temporal candidate prediction motion vector is unavailable.

292. Disney’s Accused Services perform the method of exemplary Claim 4 of the ’168 Patent. An exemplary claim chart is attached as Exhibit 8 and is incorporated by reference herein.

293. Plaintiffs are entitled to all rights to recover for present, past, and future infringement for the ’168 Patent. Plaintiffs are entitled to recover to the full extent allowable under 35 U.S.C. §§ 284-287, including for up to six years prior to the filing of this complaint. There is no marking issue under 35 U.S.C. § 287 or otherwise which would limit damages, and Plaintiffs have complied with all relevant statutes for maximum recovery under the law.

**COUNT IV: PATENT INFRINGEMENT OF THE ’996 PATENT**

294. Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

295. Disney had knowledge and notice of the ’996 Patent at least by November 7, 2025, and again through communications on September 16, 2026, and the filing of this complaint.

296. Disney infringes the ’996 Patent by, for example, making, using, selling, offering for sale, and/or importing in the United States apparatuses and/or methods covered by one or more claims of the ’996 Patent and thus directly infringes the ’996 Patent literally and/or under the Doctrine of Equivalents, in violation of 35 U.S.C. § 271. For example, Disney directly infringes the ’996 Patent through its encoding and/or decoding of bitstreams in H.265-compliant (HEVC) formats on servers in the United States, including encoding the content that is streamed, decoding as part of the encoding process; decoding to test and operate the Accused Services; and decoding for transcoding into various formats for distribution.

297. On information and belief, Disney indirectly infringes claims of the ’996 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Disney’s partners and vendors in this District and elsewhere in the United States. For example, on information and belief, as a result of Disney’s inducement, service providers directly infringe the ’996 Patent. Disney has performed and continues to perform these affirmative acts with knowledge of the ’996 Patent and with the intent, or willful blindness, that the induced acts directly infringe the ’996 Patent.

298. Upon information and belief, Disney derives revenue, directly and indirectly, from the

activities relating to the Accused Services and to infringement of the ’996 Patent, including in this District and elsewhere in the United States.

299. Disney’s infringement of the ’996 Patent is willful and deliberate. As detailed above, Disney had knowledge of the ’996 Patent and had knowledge, or was willfully blind, as to its infringement of the ’996 Patent. As discussed above, Disney has had actual knowledge of the ’996 Patent since at least November 7, 2025, when Access Advance notified Disney of the patent. Further, as discussed above, Disney knew or should have known that its actions infringe and actively induce infringement of the ’996 Patent. As discussed above, Disney specifically intended that both itself and/or its service providers infringe the ’996 Patent.

300. Disney’s infringement of the ’996 Patent has damaged and will continue to damage Plaintiffs.

301. Exemplary claim 1 of the ’996 Patent recites:

> 1. An image decoding method to decode a plurality of sub-blocks in a block, comprising;
>
> obtaining intra prediction mode information indicating an intra prediction mode;
>
> determining a decoding order among the plurality of the sub-blocks in the block based on the intra prediction mode; and
>
> decoding the plurality of the sub-blocks in the block based on the decoding order, wherein
>
> a width of the block is equal to a height of the block, and
>
> a width of a sub-block of the plurality of the sub-blocks is equal to a height of the sub-block.

302. Disney’s Accused Services perform the method of exemplary Claim 1 of the ’996 Patent. An exemplary claim chart is attached as Exhibit 9 and is incorporated by reference herein.

303. Plaintiffs are entitled to all rights to recover for present, past, and future infringement for the ’996 Patent. Plaintiffs are entitled to recover to the full extent allowable under 35 U.S.C. §§ 284-287, including for up to six years prior to the filing of this complaint. There is no marking issue

under 35 U.S.C. § 287 or otherwise which would limit damages, and Plaintiffs have complied with all relevant statutes for maximum recovery under the law.

**COUNT V: PATENT INFRINGEMENT OF THE ’820 PATENT**

304. Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

305. Disney had knowledge and notice of the ’820 Patent at least by November 7, 2025, and again through communications on September 16, 2026, and the filing of this complaint.

306. Disney infringes the ’820 Patent by, for example, making, using, selling, offering for sale, and/or importing in the United States apparatuses and/or methods covered by one or more claims of the ’820 Patent and thus directly infringes the ’820 Patent literally and/or under the Doctrine of Equivalents, in violation of 35 U.S.C. § 271. For example, Disney directly infringes the ’820 Patent through its encoding and/or decoding of bitstreams in H.265-compliant (HEVC) formats on servers in the United States.

307. On information and belief, Disney indirectly infringes claims of the ’820 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Disney’s partners and vendors in this District and elsewhere in the United States. For example, on information and belief, as a result of Disney’s inducement, service providers directly infringe the ’820 Patent. Disney has performed and continues to perform these affirmative acts with knowledge of the ’820 Patent and with the intent, or willful blindness, that the induced acts directly infringe the ’820 Patent.

308. Upon information and belief, Disney derives revenue, directly and indirectly, from the activities relating to the Accused Services and to infringement of the ’820 Patent, including in this District and elsewhere in the United States.

309. Disney’s infringement of the ’820 Patent is willful and deliberate. As detailed above, Disney had knowledge of the ’820 Patent and had knowledge, or was willfully blind, as to its infringement of the ’820 Patent. As discussed above, Disney has had actual knowledge of the ’820 Patent since

at least November 7, 2025, when Access Advance notified Disney of the patent. Further, as discussed above, Disney knew or should have known that its actions infringe and actively induce infringement of the '820 Patent. As discussed above, Disney specifically intended that both itself and/or its service providers infringe the '820 Patent.

310. Disney's infringement of the '820 Patent has damaged and will continue to damage Plaintiffs.

311. Exemplary claim 3 of the '820 Patent recites:

> 3. A method for video encoding, the method comprising:
>
> generating a prediction block by performing intra prediction on a current block for a DC mode; and
>
> generating a reconstructed block based on the prediction block and a reconstructed residual block corresponding to the current block,
>
> wherein prediction values of filtered prediction pixels of the prediction block are generated using a filter for the DC mode during the intra prediction,
>
> the filtered prediction pixels are one or more pixels located in a vertical pixel line at a leftmost side of the prediction block and one or more pixels located in a horizontal pixel line at an uppermost side of the prediction block,
>
> a prediction value of a leftmost and uppermost filtered prediction pixel among the filtered prediction pixels is generated using a 3-tap filter based on a value derived by the DC mode,
>
> the filter has a predetermined fixed filter shape, a filter tap and filter coefficients regardless of a size of the current block, and
>
> in the 3-tap filter, a filter coefficient allocated to a filter tap corresponding to the value derived by the DC mode is 2/4, a filter coefficient allocated to a filter tap corresponding to an upper reference pixel is ¼, and a filter coefficient allocated to a filter tap corresponding to a left reference pixel is ¼.

312. Disney's Accused Services perform the method of exemplary Claim 3 of the '820 Patent. An exemplary claim chart is attached as Exhibit 10 and is incorporated by reference herein.

313. ETRI is entitled to all rights to recover for present, past, and future infringement for the '820 Patent. ETRI is entitled to recover to the full extent allowable under 35 U.S.C. §§ 284-287, including for up to six years prior to the filing of this complaint. There is no marking issue under 35 U.S.C. § 287 or otherwise which would limit damages, and ETRI has complied with all relevant statutes for

maximum recovery under the law.

**COUNT VI: DECLARATORY JUDGMENT THAT PLAINTIFFS HAVE COMPLIED WITH RAND COMMITMENTS**

314. Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

315. Disney makes and uses products and services that use and comply with the H.265 Recommendation.

316. Plaintiffs are prepared to grant licenses to their essential patent claims for implementations of the H.265 Recommendation on a worldwide, non-discriminatory basis and on reasonable terms and conditions, and have at all times been willing to grant such a license to Disney.

317. Plaintiffs have negotiated in good faith with Disney, including for example, through negotiations between Disney and Access Advance.

318. Disney has given no indication that it is willing to license Plaintiffs' essential patent claims on RAND terms and has not accepted the offer referenced above.

319. On information and belief, Disney contends that claims of the Asserted Patents are essential to ITU standards and that Plaintiffs' actions, including the offer previously made to Disney, do not satisfy Plaintiffs' RAND obligations. Plaintiffs, on the other hand, contend that they have complied with any RAND obligations for their essential claims by offering a license under RAND terms. There is a case or controversy of sufficient immediacy, reality, and ripeness to warrant the issuance of a declaratory judgment.

320. Plaintiffs seek a declaration that they have negotiated in good faith toward a license with Disney for their essential patent claims and complied with any obligations they have under the ITU IPR Policy and Plaintiffs' relevant Patent Statement and Licensing declarations.

**ATTORNEYS' FEES**

321. Plaintiffs are entitled to recover reasonable and necessary attorneys' fees under applicable

law.

**DEMAND FOR JURY TRIAL**

322. Plaintiffs hereby demand a jury trial for all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor as follows and afford Plaintiffs the following relief:

A. Adjudge and declare that Disney infringes claims of the Asserted Patents;

B. Adjudge and declare that Disney's infringement of claims of the Asserted Patents was willful, and that Disney's continued infringement is willful;

C. Award Plaintiffs their actual damages going back six years from the date of the Original Complaint due to Disney's infringement;

D. Award Plaintiffs enhanced damages pursuant to 35 U.S.C. § 284;

E. Award Plaintiffs pre-judgment and post-judgment interest to the full extent allowed under the law, as well as their costs;

F. Adjudge and declare that this is an exceptional case and award Plaintiffs their reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

G. Order an accounting of damages for acts of infringement;

H. Adjudge and declare that, for Plaintiffs' patent claims subject to a RAND obligation, Plaintiffs have negotiated in good faith and satisfied their RAND obligations; and

I. Award such other relief, including equitable relief, that the Court deems appropriate.

Dated: October 7, 2026

Respectfully submitted,

**FARNAN LLP**

_/s/ Michael J. Farnan_
Brian Farnan (Bar No. 4089)
Michael Farnan (Bar No. 5165)
919 North Market Street
12th Floor
Wilmington, DE 19801
Phone: (302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiffs*

Of Counsel:

**McKool Smith P.C.**

Kevin Schubert
kschubert@mckoolsmith.com
Emily Tannenbaum
etannenbaum@mckoolsmith.com
McKool Smith P.C.
1301 6th Ave, 32nd Floor
New York, NY 10019

Mitch Verboncoeur
mverboncoeur@mckoolsmith.com
McKool Smith P.C.
303 Colorado Street, Suite 2100
Austin, TX 78701

Chris McNett
cmcnett@mckoolsmith.com
Kyra Mouser
kmouser@mckoolsmith.com
McKool Smith P.C.
1717 K Street, NW, Suite 1000
Washington, DC 20006

Eric Hansen
ehansen@mckoolsmith.com
McKool Smith P.C.
300 Crescent Ct, Suite 1500
Dallas, TX 75201